In re Marlene A. PENROD, Debtor.

**Americredit Financial Services, Inc., Appellant,**

v.

**Marlene A. Penrod, Appellee.**

BAP Nos. NC–07–1360–MkKJu, NC–07–1368–MKKJu.

Bankruptcy No. 07–30252–TC.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 24, 2008.

Filed July 28, 2008.

---

**35.** As noted above, we can affirm on any basis supported by the record. *Simo,* 316 F.3d at 980.

Randall P. Mroczynski, for Appellant.

Craig V. Winslow, for Appellee.

Before MARKELL, KLEIN and JURY, Bankruptcy Judges.

## OPINION

MARKELL, Bankruptcy Judge.

### I. Introduction

This appeal presents a pure question of law: When a debtor trades in a motor vehicle in connection with buying a new one, and the lender who is financing the purchase assumes the debtor's "negative equity" on the trade-in, how should the transaction be treated under the troublesome "hanging paragraph" of § 1325(a) of the Bankruptcy Code?

As an initial matter, we ask whether the lender's payoff of the deficiency on the trade-in is secured by a purchase money security interest in the new car, which would make it protected by the hanging paragraph. Borrowing and applying rules from the Uniform Commercial Code (UCC), we hold that it is not.

That leaves the question of what to do with that portion of the debt not entitled to purchase-money status. Courts that have looked at this question have followed two different lines of reasoning with two different outcomes. For the reasons discussed below, we believe one of them, the so-called "Dual Status Rule" fits federal law better than the other, the so-called "Transformation Rule." We thus hold that the hanging paragraph protects that portion of the lender's debt allocable to the car purchased, and does not protect that portion

of the debt that is allocable to negative equity.

The bankruptcy court in this case reached the same conclusion, and we therefore AFFIRM.

### II. Facts

On September 12, 2005, Marlene Penrod bought a 2005 Ford Taurus from Hansel Ford in Santa Rosa, California. The cash price of the car was approximately $23,500,[1] and with tax and license, the total amount that a cash buyer would have paid for the Taurus was $25,600. To finance the purchase, Penrod paid $1,000 down and traded in her 1999 Ford Explorer. The dealership gave her $6,000 in credit for the Explorer, on which she owed $13,137.42. The $7,137.42 difference is what is referred to as "negative equity" in the business of motor vehicle sales finance.

Hansel agreed to pay off the entire amount owed on the Explorer and add the negative equity to the amount Penrod financed.[2] As a result, the total amount financed appears to have been approximately $31,700. Shortly after the sale, Hansel assigned Penrod's contract to appellant Americredit Financial Services, Inc.[3]

Penrod filed a chapter 13 bankruptcy on March 2, 2007, which was 523 days after she bought the Taurus. As of the filing, the bankruptcy court found that the total amount of the debt secured by the car was $25,675, which included the negative equity.

Penrod initially proposed a chapter 13 plan that valued the Taurus at $15,615 (its then-Kelly Blue Book value). The plan

---

1. We use round numbers for convenience.

2. Penrod also agreed to pay interest at an annual rate of 20%.

3. For purposes of this appeal, we treat Americredit and Hansel as the same, as there is no issue that the assignment affected or altered any rights. *See Trejos v. VW Credit, Inc. (In re Trejos),* 374 B.R. 210 (9th Cir. BAP 2007).

reduced Americredit's secured claim to that amount, and it also reduced the rate of interest applicable to that secured debt to 9%.[4] Americredit objected, claiming that the entire amount of its claim was protected by the so-called "hanging paragraph" of § 1325(a), and, thus, the debtor could not cram down its secured claim to the car's value.

After supplemental briefing, the bankruptcy court ruled that, to the extent that Americredit's security interest in the Taurus secured Penrod's negative equity, it was not a purchase money security interest.[5] But the court also held that the remaining balance—some $18,540—was secured by a purchase money security interest.[6]

In finding that a portion of Americredit's claim was still secured by a purchase money security interest, the bankruptcy court rejected Penrod's assertion that the "Transformation Rule" rendered the entire security interest nonpurchase money. It also rejected Americredit's assertion that the negative equity was irrelevant to the purchase money characterization.

The bankruptcy court adopted the "Dual Status Rule" from state law, holding that a security interest may be simultaneously characterized as purchase money and nonpurchase money depending on the nature of the debt it secures. Seven days after its ruling on the purchase money status of Americredit's security interest, the bankruptcy court confirmed Penrod's second amended chapter 13 plan.

Americredit has appealed both the order finding that its security interest was only partially purchase money and the order confirming Penrod's chapter 13 plan.

### III. Jurisdiction

The bankruptcy court had jurisdiction under 28 U.S.C. § 1334(a), the general order of reference for the Northern District of California, and 28 U.S.C. § 157(b)(2)(A), (B) & (L). We have jurisdiction under 28 U.S.C. § 158.

### IV. Standards of Review

"[I]ssues of statutory construction and conclusions of law, including interpretation of provisions of the Bankruptcy Code," are reviewed de novo. *Mendez v. Salven (In re Mendez)*, 367 B.R. 109, 113 (9th Cir. BAP 2007) (citing *Einstein/Noah Bagel Corp. v. Smith (In re BCE W., L.P.)*, 319 F.3d 1166, 1170 (9th Cir.2003)). *See also Trejos v. VW Credit, Inc. (In re Trejos)*, 374 B.R. 210, 214 (9th Cir. BAP 2007) (interpretation of § 1325(a)'s "hanging paragraph" reviewed de novo).

### V. Discussion

Although much has been written on the issues presented, most of the opinions have been in bankruptcy courts, with a few district court appellate decisions appearing occasionally. No circuit, including the Ninth, has addressed these issues squarely, and we are not aware of any other Bankruptcy Appellate Panel decision on

**4.** The bankruptcy court relied on *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) in reducing the rate. Americredit has not challenged this reduction on appeal.

**5.** As a result of preliminary versions of these rulings, Penrod filed a second amended chapter 13 plan, which increased the amount of Americredit's secured claim to $18,540—the

difference between the amount of the secured claim under nonbankruptcy law and the amount of the negative equity.

**6.** The court did not allocate any of the payments that Penrod made to the negative equity portion of Americredit's claim. Americredit has not challenged this allocation on appeal.

point. Accordingly, we start our analysis with some basic propositions.

In bankruptcy, secured claims normally do not exceed the value of the collateral. 11 U.S.C. § 506(a)(1). Shortfalls between claim amount and collateral value are treated as unsecured claims. *Id.* Before 2005, this feature of the law allowed many chapter 13 debtors to "cram down" claims secured by cars, since cars typically are worth less than the financing against them. This treatment mirrored what the creditor could expect outside of bankruptcy: a secured claim equal to the car's value and an unsecured deficiency for the balance. The principal differences in bankruptcy were: (1) that while the secured claim had to be paid in full during the life of the plan, the debtor received a discharge at the end of the plan for any unpaid portion of the car lender's deficiency; and (2) that the debtor was able to readjust the interest rate to a market rate of interest.

For certain types of car loans, this treatment changed radically after the 2005 amendments to the Code. For those claims covered by the so-called "hanging paragraph," car lenders' secured claims were no longer limited by the car's value. The hanging paragraph essentially gives covered car lenders a secured claim for the entire amount of their claim, regardless of the car's value.

The application of these changes to this case is straightforward. Penrod's Taurus was worth approximately $15,615 at the start of the case; the amount owed to Americredit was $25,675. Penrod's initial plan assumed that the hanging paragraph did not apply and proposed to cram down Americredit's claim to $15,615 (the car's value), pay that amount over the life of the plan at 9% interest, and classify the remainder—some $10,080—as an unsecured claim.

Americredit's response asserted that the hanging paragraph applied to its entire claim of $25,765. On this view, this higher amount would have to be paid over the plan's life.

The bankruptcy court found that the portion of the secured claim attributable to negative equity—some $7,100—was not governed by the hanging paragraph but that the remainder of Americredit's claim was. Accordingly, it found that Americredit had a secured claim of $18,625 and an unsecured claim of $7,100. Based on those valuations, the bankruptcy court confirmed Penrod's plan.

### A. The Hanging Paragraph

The "hanging paragraph" is found somewhere around § 1325(a).[7] It provides:

---

7. Congress did not specify exactly where in § 1325(a) to put the hanging paragraph. The preamble to the section that contained the statutory text simply stated that:

(b) RESTORING THE FOUNDATION FOR SECURED CREDIT.—

Section 1325(a) of title 11, United States Code, is amended by adding at the end the following:

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, § 306(b), 119 Stat. 23, 80 (2005).

The text that follows in the legislation, set forth in the body of this opinion, is not indented, and the usual guides to placement are not present, leaving the reader to wonder whether it should be a new paragraph or a continuation of the last part of paragraph (9) of § 1325(a). Different services initially treated the placement of this statutory language in different ways. *Cf.* MINI●CODE, SPECIAL REDLINED EDITION 209 (April, 2005 ed., AWHFY, L.P., Publishers 2005) (no new paragraph; continuation of paragraph (9)); COLLIER PORTABLE PAMPHLET, 2005 SUPPLEMENT 423 (LexisNexis Publishers 2005) (separate new paragraph appearing after conclusion of paragraph (9)).

The current version of the United States Code places the hanging paragraph as a separate textual paragraph following paragraph (9). 11 U.S.C. § 1325 (2006).

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [*sic*] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, . . . .

Because of its odd placement in the statute as enacted, this text has no clear home in § 1325(a), and thus has been referred to as the "hanging paragraph," which is the designation this opinion will use.[8]

We have previously interpreted this provision. *In re Trejos,* 374 B.R. at 214–21. In *Trejos,* we held that the hanging paragraph applies to secured claims in chapter 13, rejecting the contention that its wording removed the statutory basis for treating such claims as "allowed secured claims" under § 1325(a). *Id.* at 217–18.[9]

### 1. *Hanging Paragraph's Requirements*

■ To receive the treatment mandated by the hanging paragraph, certain conditions must be satisfied. These conditions are as follows:

- The creditor must have a purchase money security interest; and

- The purchase money security interest must secure the debt that is the subject of the claim; and

- That debt must be incurred no more than 910 days before the date of the debtor's filing; and

- The collateral for the debt must be a "motor vehicle;" and

- That motor vehicle must have been acquired for the personal use of the debtor.

*In re Trejos,* 374 B.R. at 215.

The parties dispute only that Americredit has a "purchase money security interest." In short, the parties have either stipulated or conceded: that Penrod's Taurus secures the claim at issue; that she purchased it within 910 days of her chapter 13 filing; the Taurus is a "motor vehicle" within the meaning of 49 U.S.C. § 30102;[10] and that Penrod's use of the Taurus is personal.

The remaining issue then, to use the words of the statute, is whether Americredit "has a purchase money security interest securing the debt that is the subject of the claim." Here, the parties diverge. Penrod contends that the financing of the negative equity was not part of the pur-

---

8. Some courts have taken to referring to this statutory addition as the "starred" paragraph, as has Americredit. *See, e.g., In re Ford,* 387 B.R. 827, 829–30 (Bankr.D.Kan.2008); *Triad Fin. Corp. v. Brown (In re Brown),* 346 B.R. 246, 249 n. 1 (Bankr.M.D.Ga.2006). While this usage has merit, it makes it more difficult to electronically search opinions that use this designation because electronic services such as Lexis and Westlaw use the asterisk (" * "), the symbol commonly used to represent the star, as a universal search character.

9. Not addressed in *Trejos* was the effect of the hanging paragraph on the modification of the applicable interest rate under § 1325(a)(5) to produce a stream of payments on the allowed secured claim equal to its present value. Since Americredit has not raised the issue in this appeal, we do not consider it. As noted in *Trejos,* "we save it for another day." 374 B.R. at 220 n. 9. *Cf. Drive Fin. Servs., L.P. v. Jordan,* 521 F.3d 343, 349–50 (5th Cir.2008) (*Till* remains good law after enactment of the hanging paragraph).

10. 49 U.S.C. § 30102(a)(6) states that " 'motor vehicle' means a vehicle driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways, but does not include a vehicle operated only on a rail line."

chase money security interest. Americredit disagrees.

### 2. Definition and Role of "Negative Equity"

Much ink has been spilled over the proper characterization and treatment of negative equity in secured claims subject to the hanging paragraph. Before sorting through the various analyses, however, it is appropriate to state exactly what is being discussed.

#### a. What Is It?

Negative equity arises when a consumer trades in a car that is "under water"—a car that has more debt against it than it is worth—and the new seller rolls the deficiency on the old car into the debt on the new. An example illustrates the point. Assume that the debtor buys a new car. Dealer takes the old car in trade for $10,000, but the trade-in car has $15,000 in debt against it. The $5,000 deficiency, or the "negative equity," is rolled into the debt secured by new car.

In this case, Penrod traded in a car for which she received $6,000 in credit, but that had more than $13,100 in debt against it. The $7,100 difference is the negative equity.

Negative equity is a substantial and recurring issue. A leading car lender, General Motors Acceptance Corporation, has stated in defending a similar claim that between 26% and 38% of all its new car financing involves "negative equity." *In re Peaslee*, 358 B.R. 545, 554 (Bankr. W.D.N.Y.2006) ("*Peaslee I*"). *See also* BARKLEY CLARK & BARBARA CLARK, SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶ 12.05[10][b] & n. 17 (rev. ed.2007) (listing same range, and quoting J.D. Powers & Associates study).

There is much unease about the proper treatment of negative equity under the hanging paragraph. Part of this unease is that "negative equity" is a term not unlike "deferred maintenance"; that is, it seems to be an oxymoron at war with itself. Equity in property usually is a positive amount and represents an accumulation of wealth available to the property's owner. The use of the term "negative" equity cuts against that notion.

Another part of the unease is that the amount represented by negative equity is essentially another creditor's unsecured claim. When Penrod traded in her Explorer, she owed $7,100 more to the entity that financed that vehicle than it was worth. Had she defaulted on the loan to that lender, the amount represented by negative equity would have been no more than a general unsecured claim against Penrod. Bankruptcy has a long history of distrust of the conversion of unsecured claims into secured claims, *e.g., Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917) (substituting secured debt for unsecured debt held to be an intentional fraudulent conveyance). That distrust also presents itself here.

#### b. What Turns on the Characterization?

Besides this general unease, the stakes are potentially high. To confirm a chapter 13 plan, a debtor must provide for payment in full of all secured claims. 11 U.S.C. § 1325(a)(5). Unsecured claims, however, need only be paid their aliquot portion of the debtor's disposable income over the life of the plan. 11 U.S.C. § 1325(b)(1). The effect of finding that negative equity is secured by a purchase money security interest would be the transformation of all debt secured by the car—regardless of whether it is effectively secured or unsecured—to secured debt, with all its attendant feasibility and other

issues related to plan confirmation. In the larger scheme of things, this is generally not an issue about whether the debtor retains more of his or her disposable income at the expense of creditors. Rather, it is an intercreditor issue: whether car lenders who fit within the "hanging paragraph" will receive more of a debtor's disposable income than the debtor's general unsecured creditors.

### B. What Is A "Purchase Money Security Interest" Under the Hanging Paragraph?

The concept of a purchase money security interest or lien has had a long and venerable history in commercial law. *See* 2 GRANT GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY § 28.1, 745 n. 3 (1965) (tracing concept to 1631 and to Coke's *Commentaries on Littleton* ). Its origin in real estate law continues today and is reflected in various statutory schemes, such as those in effect in California. *See, e.g.,* CAL.CODE CIV. PRO. 580b (precluding purchase money lenders and vendors on real estate from obtaining a deficiency judgment against the borrower after foreclosure). *See Spangler v. Memel,* 7 Cal.3d 603, 610, 498 P.2d 1055, 1059, 102 Cal.Rptr. 807, 811 (Cal.1972)(stating that " 'the standard purchase money mortgage transaction [is one] in which the vendor of real property retains an interest in the land sold to secure payment of part of the purchase price.' ")(quoting *Roseleaf Corp. v. Chierighino,* 59 Cal.2d 35, 41, 378 P.2d 97, 100, 27 Cal.Rptr. 873, 876 (Cal.1963)); *Union Bank v. Anderson,* 232 Cal.App.3d 941, 946, 283 Cal.Rptr. 823, 826 (Cal.App. Ct.1991) (same).

Purchase money financing concepts also hold a central place in the law of personal property security. Article 9 of the UCC, as revised in 1999 and generally effective in all states on July 1, 2001 ("UCC"), devotes an entire section to it, UCC § 9–103, and there is a substantial body of case law devoted to its intricacies. *See, e.g.,* CLARK & CLARK, *supra,* at ¶ 3.09; JAMES J. WHITE & ROBERT SUMMERS, UNIFORM COMMERCIAL CODE §§ 31–6 & 33–5 (5th ed.2002).

### 1. What Law Defines It?

This background heightens the importance of how to define a purchase money security interest (variously, "PMSI") for purposes of the hanging paragraph. When Congress enacted the hanging paragraph in 2005, it did not include a definition of a PMSI. That is not unusual; the 1978 Code had previously used the term without an explicit definition, and courts freely borrowed from the UCC when interpreting the provisions that contained "purchase money security interest." *See, e.g., Pristas v. Landaus of Plymouth, Inc.,* 742 F.2d 797, 800 (3d Cir.1984) (11 U.S.C. § 522(f)); *In re Donald,* 343 B.R. 524, 536–37 (Bankr.E.D.N.C.2006)(11 U.S.C. § 522(f) and hanging paragraph, dicta); *In re Pan Am. Corp.,* 125 B.R. 372, 376 (S.D.N.Y.), *aff'd,* 929 F.2d 109 (2d Cir.), *cert. denied,* 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991) (former 11 U.S.C. § 1110); H.R. REP. No. 595, 95TH CONG., 1ST SESS. 240 (1977) (former 11 U.S.C. § 1110).

This borrowing has generally followed the Supreme Court's standard for incorporating state law understandings into federally defined terms:

Our cases indicate that a court should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards, *see, e.g. Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–367, 63 S.Ct. 573, 574–575, 87 L.Ed. 838 (1943), or when express provisions in analogous statutory schemes embody

congressional policy choices readily applicable to the matter at hand. *See, e.g., Boyle v. United Technologies Corp.,* 487 U.S. 500, 511–512, 108 S.Ct. 2510, 2518–2519, 101 L.Ed.2d 442 (1988); *DelCostello v. Teamsters,* 462 U.S. 151, 169–172, 103 S.Ct. 2281, 2293–2295, 76 L.Ed.2d 476 (1983). Otherwise, we have indicated that federal courts should "incorporat[e] [state law] as the federal rule of decision," unless "application of [the particular] state law [in question] would frustrate specific objectives of the federal programs." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).

*Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 98, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991); *Dzikowski v. N. Trust Bank of Fla. (In re Prudential of Fla. Leasing, Inc.),* 478 F.3d 1291, 1298 (11th Cir.2007) (issue of whether understanding of "single satisfaction" under Florida law informs interpretation of § 550(d)). Moreover,

> [t]he presumption that state law should be incorporated into federal common law is particularly strong in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards. *See* [*Kimbell Foods,* 440 U.S.] at 728–729, 739–740, 99 S.Ct., at 1458–1459, 1464–1465 (commercial law)...."

*Kamen,* 500 U.S. at 98, 111 S.Ct. 1711.

As a result, unless there are good reasons to depart from it, the UCC satisfies these requirements; it is, for the most part, a unifying code governing commercial transactions across and among the states that have adopted it. We thus start with the presumption that the hanging paragraph's use of "purchase money secu-

rity interest" should be construed consistently with the same term as in the UCC.

### 2. The Role of the UCC

A detailed examination of the UCC's use of "purchase money security interest," as modified in 2001, illustrates both the unifying and the fragmented features of that provision, at least with respect to its relevance to the hanging paragraph.

### a. Definitions

Section 9–103 of the UCC defines purchase money security interests for the UCC. It states:

> A security interest in goods is a purchase-money security interest:
>
> > (1) to the extent that the goods are purchase-money collateral with respect to that security interest;.... [11]

UCC § 9–103(b). To understand this definition, however, a reader must also examine the embedded definitions it uses. These include the definitions of "purchase-money collateral" and "purchase-money obligation," terms that are defined in § 9–103(a) of the UCC:

> > (1) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
> >
> > (2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

UCC § 9–103(a)(1) & (2).

The definition of "purchase-money obligation" is relevant here, as it defines two types of debt that may qualify: seller-

---

11. Other paragraphs of § 9–103(b) extend the concept of a purchase money security interest with respect to inventory and software, categorizations of collateral not applicable here.

based purchase money obligations, and financier-based purchase money obligations.

Seller-based PMSIs derive from the first part of UCC § 9–103(a)(2). That section states that a purchase-money obligation may consist of an "obligation of an obligor incurred as all or part of the price of the collateral...." UCC § 9–103(a)(2). As a result, a seller who transfers goods to a buyer while retaining a property interest in those goods retains a PMSI. The deferred purchase price is the purchase-money obligation, and the goods transferred are the purchase-money collateral. This usage comports with the traditional understanding of purchase money financing: a merchant retaining some interest in the property sold as a hedge against nonpayment of the purchase price.[12] The inquiry under this section is thus whether the obligation incurred was part of the price of the collateral. In this case, the issue would be whether the negative equity was part of the price of the Taurus.

Financier-based PMSIs derive from the second part of UCC § 9–102(a)(2). That provision states that a purchase-money obligation may also consist of "an obligation of an obligor incurred ... for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." UCC § 9–103(a)(2). As a result, if a bank extends credit to enable a buyer to purchase a car, the obligation to the bank is given for value in the form of the bank's enabling loan and is thus a "purchase-money obligation." The security interest in the car, the good acquired with the value given, is a PMSI. In terms of this case, the issue would be whether Penrod's obligation to Americredit, as it relates to the $7,100 in negative equity added to the amount financed, was given to enable Penrod to actually acquire the Taurus.

b. *Effects and Consequences Under The UCC of Characterization as a PMSI*

PMSI characterization is not an end unto itself. The characterization is important because the UCC grants special rights to holders of claims secured by PMSIs, both in perfection and in priority. These rights arise in two basic situations.

The first has to do with common situations in which a seller retains a security interest in goods acquired as "consumer goods." In this scenario, Article 9 does not require a creditor to file a UCC–1 financing statement in order to perfect a PMSI in consumer goods. UCC § 9–309(1).[13] This enables retailers to take a security interest in goods bought by consumers without clogging the filing system.

A second benefit conferred on holders of PMSIs has to do with priority. Holders of PMSIs in goods or software can obtain priority over a prior-filed lien; this is an exception to the general "first in time is first in priority" structure used by the UCC. UCC § 9–324. This exception has generally been justified on equitable notions: it protects vendors of goods from after-acquired property clauses generally used by banks and other financiers. *See* GILMORE, *supra,* at 779 ("What might be called the 'Don't be a Pig' school of advice to Article 9 lenders has a fashionable currency and may be expected to have some influence on lending patterns."); James J.

---

12. That understanding also comports with similar historical understandings in the law of purchase money interest of real property. *See, e.g., Chierighino,* 59 Cal.2d at 41, 378 P.2d at 100, 27 Cal.Rptr. at 876 (Cal.1963) (Traynor, J.).

13. Security interests in consumers' cars, of course, are not perfected by the filing of a financing statement. Certificate of title statutes control. UCC § 9–311(a)–(b).

White, *Reforming Article 9 in Light of Old Ignorance and the New Filing Rules,* 79 MINN. L.REV. 529, 562 (1995) ("[T]he most persuasive claim for purchase money priority is the fairness argument—that reasonable businesspeople expect to have priority when they sell goods from their own stock.").

These exceptions often lead to litigation and to efforts to characterize transactions in which elements of both normal and purchase-money financing exist. As was acknowledged before Article 9's revision and afterward, a security interest—the contingent "interest in personal property or fixtures which secures payment or performance of an obligation" [14]—can be both purchase-money and nonpurchase-money at the same time, either through refinancing, cross-collateralization, or cross-default clauses. The issue then arises as to whether the PMSI survives, and if so, how to treat it. Several views arose.

The harshest rule for creditors was the Transformation Rule. Under this rule, mixing the PMSI with non-PMSI debt or collateral destroyed the PMSI, and nullified all the benefits given to the holder of a PMSI. *See, e.g., Snap–On Tools, Inc. v. Freeman (In re Freeman),* 956 F.2d 252 (11th Cir.1992); CLARK & CLARK, *supra,* at ¶ 3.09[2][c][i].

An alternate view arose that focused on former Article 9's use of "to the extent" in the section describing a PMSI. See UCC § 9–107 (1995 Official Text). This language was thought to authorize a security interest's characterization as part PMSI and part non-PMSI. This Dual Status Rule allowed creditors to retain the benefits of purchase money status for some of the debt or collateral, but it raised issues related to that allocation. *See, e.g., Billings v. Avco Colo. Indus. Bank (In re*

*Billings),* 838 F.2d 405 (10th Cir.1988); *In re Pan Am Corp.,* 124 B.R. 960, 970–72 (Bankr.S.D.N.Y.), *aff'd mem.,* 125 B.R. 372 (S.D.N.Y.), *aff'd,* 929 F.2d 109 (2d Cir.), *cert. denied,* 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991) (§ 1110).

### 3. Issues for This Appeal

If Article 9's understandings of purchase money security interests guide interpretation of the hanging paragraph, several questions arise. First, is negative equity part of the "price" of the purchase of the car under § 9–103(a)(2)? In particular, was the $7,100 in debt assumed by Americredit part of Penrod's purchase price? Second, and independently, is negative equity part of the "value given to enable the debtor to acquire rights in" the car? Here, that question would be whether Americredit's assumption of the unsecured deficiency was "value" that "enable[d]" Penrod to acquire the Taurus.

If the answer to either of these questions is yes, then the entire amount of the debt owed to Americredit is secured by a purchase money security interest and must be paid in full through the plan. If, however, any portion of Americredit's claim represented by negative equity cannot be characterized as purchase-money debt, we then reach the issue of whether the combination of that debt with purchase-money debt invokes the Transformation Rule or the Dual Status Rule. And only if the Dual Status Rule is applicable do we reach issues of allocation between what is purchase-money debt and what is not.

### C. How Should Federal Courts Interpret Negative Equity and PMSIs under § 1325(a)'s Hanging Paragraph?

 A great deal of attention has been

---

**14.** Revised UCC § 1–201(b)(35) (Official 2007 Text), incorporated into Revised Article 9 by

§ 9–102(c).

paid to the proper role of negative equity.[15] Cases exist going both ways. *See In re Sanders*, 377 B.R. 836, 845 (Bankr. W.D.Tex.2007). But on balance, the better-reasoned cases find that the portion of a secured creditor's claim that is allocable to negative equity is not supported by a PMSI.

### 1. *Is Negative Equity Part of the Purchase Price?*

Courts have held that the financing extended to cover negative equity is part of the "price of the collateral," relying primarily on two arguments: the first construes Official Comment 3 to § 9–103 of the UCC to include negative equity; and the second invokes the doctrine of in pari materia to conflate the definition of cash sale price contained in state automobile sales and finance laws with the term "price of the collateral" in UCC § 9–103. Neither is ultimately persuasive.

#### a. *"Price of the Collateral" and Comment 3*

Section 9–103 refers to the "price" of the collateral, but the UCC does not define "price." Official Comment 3 provides some guidance as to its meaning:

> [T]he "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

In analyzing this passage, one court on appeal has stated that "[i]t is not apparent why a refinancing of rolled-in negative equity on a trade-in as part of a motor vehicle sale could not constitute an 'expense incurred in connection with acquiring rights in' the new vehicle." *General Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 259 (W.D.N.Y.2007) (*"Peaslee II"*). The court continued: "[i]f the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is difficult to see how that could not be viewed as such an expense." *Id.* (emphasis in original). *See also In re Austin*, 381 B.R. 892 (Bankr. D.Utah 2008); *In re Schwalm*, 380 B.R. 630 (Bankr.M.D.Fla.2008); *In re Weiser*, 381 B.R. 263 (Bankr.W.D.Mo.2007).

Official Comment 3 further requires that for a PMSI to arise, there must be a "close nexus between the acquisition of the collateral and the secured obligation." Com. 3 to UCC § 9–103. Some courts have found this close nexus in the financing of negative equity because the parties have agreed to a "package transaction." *See, e.g., Graupner v. Nuvell Credit Corp. (In re Graupner)*, 4:07–CV–37CDL, 2007 WL 1858291 at *2 (M.D.Ga. June 26, 2007) ("The negative equity is inextricably intertwined with the sales transaction and the financing of the purchase."); *In re Vinson*, 391 B.R. 754 (Bankr.D.S.C.2008).

---

**15.** In rationalizing a long explanation of issues similar to those analyzed in this opinion, Judge James Haines had this to say:

> I say the explanation will be lengthy. Although it will be long enough to test many readers' patience, I do not intend to recite the rationale's recipe from scratch. Many courts have explained the issues and options comprehensively. This opinion will reference their work and refer the reader to it, rather than repeat it here.

*In re Look*, 383 B.R. 210, 212 n. 2 (Bankr. D.Me.2008). To the extent possible, this opinion adopts Judge Haines's rationalization and attempts also to reduce the repetition of arguments already made and resolved by other judges. The end result, however, is still "long enough to test many readers' patience."

Using the same sources, many other courts hold that negative equity is not a component of the "price of the collateral." One line of reasoning refutes the idea that negative equity is one of the "expenses incurred in connection with acquiring rights in the collateral" contemplated by Official Comment 3. These cases essentially hold that such a major part of the purchase price can hardly be a form of "expense" incurred in order to acquire the car. *See, e.g., In re Wear*, 64 UCC Rep. Serv.2d 969, 2008 WL 217172 (Bankr. W.D.Wash.2008); *In re Look*, 383 B.R. 210 (Bankr.D.Me.2008); *In re Riach*, 65 UCC Rep. Serv.2d 25, 2008 WL 474384 (Bankr. D.Or.2008); *In re Pajot*, 371 B.R. 139, 149–50 (Bankr.E.D.Va.2007); *In re Price*, 363 B.R. 734, 741 (Bankr.E.D.N.C.2007).

*Sanders* contains a good discussion of this point:

> The [expense] items listed [in Official Comment 3] are closely connected with the purchase of the vehicle itself—compensating the seller for the cost of delivering the vehicle, repaying the seller for sales taxes realized from the sale of the vehicle, paying for such administrative charges as title costs and license fees associated with transferring ownership of the vehicle from seller to buyer, and the like. In addition, the list includes costs normally associated with the enforcement of the security interest once granted. . . .

*In re Sanders*, 377 B.R. at 855. *See also In re Conyers*, 379 B.R. at 581; *In re Pajot*, 371 B.R. at 152.[16]

Given that financing negative equity is increasingly common, it was likely not an oversight that the reporters for Article 9 did not include negative equity in Comment 3's list of "expenses incurred in connection with acquiring rights in the collateral." *In re Blakeslee*, 377 B.R. 724, 728–29 (Bankr.M.D.Fla.2007). Further, negative equity is not of the same "type" or "magnitude" as the expenses listed in Official Comment 3. *Id.* at 729.

Other courts reach the same conclusion by reading Comment 3 to mean that simply including negative equity in a single car contract does not by itself create a sufficient nexus between the acquisition of the collateral and the secured obligation to transform negative equity into part of the price of the vehicle. Rather, in that circumstance, there are simply "two separate financial transactions memorialized on a single retail installment contract document. . . ." *In re Price*, 363 B.R. at 741. *See also Citifinancial Auto v. Hernandez–Simpson*, 369 B.R. 36 (D.Kan.2007); *In re Mitchell*, 379 B.R. 131 (Bankr.M.D.Tenn. 2007).

This line of reasoning is exemplified by *Sanders*:

> Context thus bolsters the conclusion that "price of the collateral" need not be given some exotic meaning or treated as some peculiar argot to sweep up more than the common understanding of the phrase is intended to convey. One may borrow money to buy something (*e.g.*, a new vehicle), and also borrow additional money for some other purpose (*e.g.*, to pay off the balance of a loan for the trade-in vehicle). The part used to buy

---

**16.** But in *In re Austin* the court found, on the facts of the case, that financing the negative equity was necessary to acquire rights in the vehicle. 381 B.R. 892 (Bankr.D.Utah 2008). There, the debtors could not afford payments on both the new vehicle and the trade-in and would have presented a credit risk if they otherwise failed to pay the balance on the trade-in before buying the new vehicle. *Id.* at 894. The bank testified that the debtors would not have qualified for, and the bank therefore would not have financed, a loan without including the negative equity. *Id.*

something is purchase money obligation. The part used for some other purpose is not. We can tell what part was used to buy something by simply looking at the price of the thing purchased.

*In re Sanders*, 377 B.R. at 853.

The result in *Sanders* and like cases better reflects the goals of chapter 13 and the language of the hanging paragraph. "Negative equity is not similar in nature or scope to the other 'expenses incurred in connection with acquiring rights in the collateral' contemplated by Official Comment 3." *In re Johnson*, 380 B.R. 236, 243 (Bankr.D.Or.2007). More importantly, as *Lavigne* noted, the critical issue is that the liability for negative equity is not an expense "incurred in connection with acquiring" the car; it is the auto seller's assumption of one of debtor's antecedent debts.

That liability necessarily preceded the acquisition. The preexisting indebtedness was simply rolled into the new car loan. As the court observed in *Pajot*, "the substance of the transaction, although instantaneous, is that the second creditor is paying off the debtor's unsecured deficiency debt on the first vehicle." *Pajot*, 371 B.R. at 154.

*In re LaVigne*, 2007 WL 3469454 at *8.

b. *"Price of the Collateral" and In Pari Materia*

■ Many states, as part of legislation designed to inform consumers of the true cost of credit, require financiers to disclose negative equity as part of the price of a new car loan. *See Graupner*, 2007 WL 1858291, at *2 n. 2; *In re Cohrs*, 373 B.R. 107 (Bankr.E.D.Cal.2007); *In re Petrocci*, 370 B.R. 489, 501 (Bankr.N.D.N.Y.2007); *Peaslee II*, 373 B.R. at 260. Since a state statute thus includes negative equity in a definition of price, these courts invoke the interpretive doctrine of in pari materia and interpret "price" in Article 9 the same as in the state disclosure law. *See, e.g., GMAC v. Horne*, 390 B.R. 191 (E.D.Va. 2008).

Courts have rejected this reasoning for many good and sufficient reasons. First, some courts hold that because the term "price of the collateral" in § 9–103 is not ambiguous, the doctrine of in pari materia is not available. *See In re Blakeslee*, 377 B.R. at 728; *In re Acaya*, 369 B.R. 564, 570 (Bankr.N.D.Cal.2007). At least one other court declined to use the in pari materia doctrine to graft the definition of "cash sale price" from state automobile sales and finance laws onto the term "price of the collateral" as used in the UCC because the two statutes do not relate to the same subject matter or do not have the same purpose. *See, e.g., In re Lavigne*, Nos. 07–30192, 07–31402, 07–31247, 06–32914, 2007 WL 3469454, at *7 (Bankr. E.D.Va. Nov.14, 2007).

Despite these arguments, Americredit requests that we use California's doctrine of in pari materia to incorporate into the UCC term "price of the collateral" the definition of "cash sale price" from California's automobile sales and finance law, found at CAL. CIVIL CODE § 2981(e).[17] We do not adopt this argument. As an initial matter, it would require us to use a state-

---

17. That section provides:

(e) "Cash price" means the amount for which the seller would sell and transfer to the buyer unqualified title to the motor vehicle described in the conditional sale contract, if the property were sold for cash at the seller's place of business on the date the contract is executed, and shall include taxes to the extent imposed on the cash sale and the cash price of accessories or services related to the sale, including, but not limited to, delivery, installation, alterations, modifications, improvements, document preparation fees, a service contract, a vehicle contract cancellation option agreement, *and payment of a prior credit or lease balance remaining on property being traded in.*

Cal. Civil Code § 2981(e)(emphasis added).

law based interpretive rule to construe how a federal statute would incorporate a state statute. That is too convoluted to withstand any rigorous analysis under *Kamen* or any other authority.

In addition, the statute that Americredit points to does not apply to car loans extended by state or federally chartered banks, CAL. CIVIL CODE § 2982.5(d)(6), thereby raising the possibility of a difference of application due solely to the status of the creditor, a result violently at odds with the general goal of uniformly construing federal statutes.

Even if employed California's doctrine of in pari materia, it would fail for two reasons. First, the provisions of the California Civil Code are part of a regulatory network based on disclosure. Including negative equity in these provisions ensures that consumers know what they are getting into—and that is the sole function of these provisions, which are designed to inform the vast majority of consumers who buy cars and finance negative equity, but never file bankruptcy.

When looking at the hanging paragraph, however, the function is starkly different: instead of disclosure designed to protect consumers, giving negative equity PMSI status effectively enriches car lenders at the expense of the debtor's unsecured creditors. With such different effects and goals, the two provisions—one based on disclosure and the other on preference— are not in pari materia. *See In re Acaya*, 369 B.R. at 568–71 (analyzing history of § 2981(e)).[18]

Second, the California legislature itself has indicated that interpretation of its version of Article 9 should not be affected by the provisions of Civil Code § 2981. Notably, § 9201(b) of the California UCC provides that a transaction subject to California's version of Article 9 is also subject to the provisions of the California's Automobile Sales Finance Act (of which § 2981 is a part), stating:

> (b) A transaction subject to this division [9 of the California Uniform Commercial Code] is subject to . . . the Automobile Sales Finance Act, Chapter 2b (beginning with Section 2981) of Title 14 of Part 4 of Division 3 of the Civil Code. . . .

CAL. COM.CODE § 9201(b). We read this to mean that both acts operate independently, thereby essentially negating any legislative intent that similar provisions in each be construed identically. *In re Acaya*, 369 B.R. at 568 (citing *Bank of Am. v. Lallana*, 19 Cal.4th 203, 77 Cal.Rptr.2d 910, 960 P.2d 1133 (1998)). *See also Thompson v. 10,000 RV Sales, Inc.*, 130 Cal.App.4th 950, 31 Cal.Rptr.3d 18 (Cal.Ct.App.2005) (reviewing function and purpose of disclosure of negative equity under California law).

As a result, negative equity is not part of the price as that term is used in California's version of § 9–103(a)(1).

### 2. Does Financing Negative Equity Enable the Acquisition of the Purchased Collateral?

A purchase-money obligation can also arise based on "value given to enable the

---

**18.** That negative equity is not part of the price is also negated somewhat by the structure of federal regulation of consumer credit. Regulation Z, which regulates the disclosure of consumer credit terms, does not explicitly include negative equity as part of the "cash price." It defines "cash price" as:

> (9) Cash price means the price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration. The term does not include any finance charge.

12 C.F.R. § 226.2(a)(9) (2007).

debtor to acquire rights in or the use of the collateral if the value is in fact so used." UCC § 9–103(a)(2). Not surprisingly, there is considerable overlap in the analyses that courts have used in interpreting the phrase "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used" and in determining the meaning of "price of the collateral." That overlap principally occurs when construing Official Comment 3 to § 9–103, and its indication that "[t]he concept of 'purchase-money security interest' requires a close nexus between the acquisition of collateral and the secured obligation."

There is greater division among courts on the question of whether "value given" in the form of financing negative equity creates a close nexus with the acquisition of collateral. Some courts have found the requisite close nexus based on the package or unitary nature of the transaction itself. For instance, in finding that "[t]he phrase, 'value given to enable the debtor to acquire rights in' purchase money collateral is broad enough to include the 'negative equity' financed by a lender," one court found the required "close nexus" between the acquisition of the property and the secured obligation existed where the financed negative equity was "part of a single transaction and all components of the obligation incurred [were] for the purpose of acquiring the property securing the new obligation." *In re Cohrs*, 373 B.R. at 109–10. *See also In re Brei*, No. 4:07–BK–01354–JMM, 2007 WL 4104884 at *1 (Bankr. D.Ariz. Nov.14, 2007); *In re Petrocci*, 370 B.R. at 499.

Other courts have determined that negative equity financing does not provide the direct assistance for purchasing a vehicle that the standard "for value given to enable the debtor to acquire rights in … the collateral" requires. For example, *Sanders* recognized a distinction between facilitating a transaction and enabling a debtor to acquire rights in a new vehicle. "The fair implication of this [condition that the value given be 'in fact so used'] is that the value must be used to acquire *rights* in the collateral, as opposed to, for example, *enabling the transaction* that ultimately results in the borrowers acquiring rights in the collateral." *In re Sanders*, 377 B.R. at 855 (emphasis in original); *In re Blakeslee*, 377 B.R. at 729. *See also In re Pajot*, 371 B.R. at 154. *See also GMAC v. Horne*, 390 B.R. 191 (sums advanced for gap insurance, disability insurance, extended warranties and service contracts were not secured by PMSIs, and thus amounts related thereto could be bifurcated).

Still other courts look to the language "value given to enable" in an effort to determine whether financing negative equity qualifies as a purchase money obligation. Starting with *Black's Law Dictionary's* definition of "enable," the *Conyers* court concluded that financing negative equity was not required for the debtor to purchase a new vehicle. Rather, the loan of additional money was "a convenience and an accommodation to the Debtor." *In re Conyers*, 379 B.R. at 582.[19]

*Acaya* found the words "value given to enable the debtor to acquire rights in or the use of the collateral if the value is in

**19.** An argument exists within Article 9 that value given is an exceptionally easy concept to meet. Under the UCC generally, "value" is defined not only as something sufficient to support a simple contract, but also as the granting of a security interest, or the existence or assumption of antecedent debt. UCC § 1–204 (2003). Thus, a lender can easily say that "value" in the form of a loan assumption on the trade-in was given to the debtor. As developed in text below, the existence of value in a transaction is not the same as providing value that enables the debtor to acquire goods.

fact so used" were ambiguous in the context of the hanging paragraph. *In re Acaya*, 369 B.R. at 569. Applying *Matthews v. Transamerica Fin. Servs. (In re Matthews)*, 724 F.2d 798 (9th Cir.1984), which held that a refinance destroyed the purchase money character of an obligation, as part of its rationale, the Acaya court concluded that "the amount used to pay the negative equity does not constitute ... value given to acquire rights in the collateral...." *In re Acaya*, 369 B.R. at 570.

In *Matthews*, the Ninth Circuit addressed the character of an enabling loan in deciding a motion to avoid a non-PMSI in debtor's property under § 522 of the Bankruptcy Code. *Matthews*, 724 F.2d at 799–801. While *Matthews* arose in the context of lien avoidance and predated the enactment of revised Article 9, it is nevertheless instructive for this case. Prerevision UCC § 9–107 defined a PMSI as a security interest taken by a person who "gives value to enable the debtor to acquire rights in or use of collateral if such value is in fact so used."[20] *Matthews* articulates that a refinance constitutes value to enable debtors to pay off a loan, not to acquire rights in collateral. Speaking to the apparent harshness of the loss of a PMSI through a refinance, the *Matthews* court stated:

> The argument that form should not be elevated over substance has merit in some settings, but not here. We are dealing with a statutory scheme that governs the priorities among creditors. Purchase money security is an exceptional category in the statutory scheme that affords priority to its holder over other creditors, but only if the security is given for the precise purpose as defined in the statute. And we should not

lose sight of the fact that the lender chooses the form.

*Id.* at 801.

Given the ease with which a transaction under the UCC can be infused with "value" (see note 19 above), it is not enough under § 1325(a) that value be given to acquire rights in the vehicle. As noted by *Sanders*, under § 9–103 the value given must be "in fact so used." 377 B.R. at 855. In most cases, including the current appeal, the financed negative equity is nothing more than a refinancing of the preexisting debt owed on the trade-in. There is no necessary connection between this refinancing and the car's acquisition. If Penrod had shown up with no trade-in, the amount ultimately financed for the same car would have been $7,100 less (assuming that Penrod paid the extra $6,000 as a down payment).

Similarly, to take a fanciful example, if a car lender offered to pay off a car buyer's second mortgage as a promotional campaign for new car sales, and then rolled the amount of the mortgage into the amount financed, the payment of the mortgage would be value under § 1–204, but it could not fairly be said to be part of the purchase-money debt. The distinction that *Sanders* makes between debt incurred to acquire the car and debt incurred to finance the car is relevant. Accordingly, there is not the requisite close nexus between "value given" and Penrod's acquisition of rights in the Taurus.

Since neither paragraph of § 9–103(a) applies here, it cannot be said that the negative equity assumed by Americredit is purchase-money debt. As such, that part of Americredit's claim that consists of negative equity is not secured by a purchase money security interest.

---

**20.** This is essentially the same phrase used in the current UCC § 9–103(a)(2), except that in the current version, the article "the" is inserted before "collateral."

**D. If Americredit's Security Interest Is Not Entirely a PMSI, What Should Be the Effect Under 1325(a)?**

██ If, as we have determined above, a creditor's PMSI does not secure negative equity, then the focus turns to the secured creditor's proper treatment under the hanging paragraph. At least two different results have been suggested: that the creditor should lose the entire benefit of the hanging paragraph, or that the creditor should receive the benefits of the hanging paragraph, but only to the extent that the security interest is a PMSI.[21]

**1. The Decreased Need to Defer to State Law**

██ Here, as before, *Kamen's* indication that state law should normally be used to fill any gaps guides us. *Kamen*, 500 U.S. at 98, 111 S.Ct. 1711. But *Kamen* is not inflexible, and its result is not inexorable. "[F]ederal courts may properly devise a uniform federal common law when 'the scheme in question evidences a distinct need for nationwide legal standards, or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand, ... [or when] application of [the particular] state law [in question] would frustrate specific objectives of the federal programs.'" *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir. 1998) (quoting *Kamen*, 500 U.S. at 98, 111 S.Ct. 1711) (citations and quotations omitted).

There are at least three reasons under this standard for federal courts to depart from the traditional deference to the UCC when construing the effect of a "hybrid" PMSI. First, the UCC itself neither prescribes a uniform result, nor is it uniform from state to state on this point. This engenders a need to develop uniform federal standards for the unitary interpretation of the hanging paragraph. Second, the main comment to the relevant UCC section indicates that the terms in that statute were not designed to inform or influence the Bankruptcy Code. This undercuts any argument designed to transfer understandings from the UCC to the hanging paragraph based on commercial understandings that the UCC understanding should control any time any statute used the term "purchase money security interest." Third, and related to the second point, an examination of the UCC's development and use of "purchase-money security interest" reveals a substantially different purpose, both in practice and in drafting, that the same term serves in the hanging paragraph.

**a. The Nonuniform Treatment of Consumer PMSIs Under the UCC**

Dividing a creditor's secured claim into two—one secured by a PMSI, and the other not—would normally not raise issues under *Kamen* if the consequences of such a division were clear and easy to apply. But Article 9 is far from clear on this point. The starting point of this analysis is the many perfection and priority issues that PMSIs raise. Given the special status of PMSIs in UCC perfection and priority

---

**21.** Arguably, a third view exists: ignore the fact that negative equity does not support PMSIs. *Cf.* Clark & Clark, *supra* ¶ 6.10[4][d]. We reject this view for at least two reasons. First, it is in part based on the notion that negative equity can be secured by a PMSI. As noted above, we reject that premise. Second, once we determine that negative equity is not secured by a PMSI in this case, there must be some consequence under § 1325(a). Otherwise, we essentially ignore the words "purchase money security interest" in the hanging paragraph.

disputes, many prerevision judicial decisions debated to what extent a vendor or other secured party could extend or modify the purchase money concept. *See* CLARK & CLARK, *supra*, ¶ 3.09. The extent to which a PMSI could be cross-collateralized or cross-defaulted with non-PMSI collateral and debt was hotly debated. *Id.*

Revised Article 9 sought to settle these issues as to nonconsumers. In particular, under Revised Article 9, the holder of a nonconsumer PMSI may: cross-secure nonpurchase-money debt as well as purchase-money debt, § 9–103(f)(1); cross-collateralize purchase money collateral with nonpurchase money collateral, § 9–103(f)(2); renew, refinance, consolidate or restructure purchase-money security interests, § 9–103(f)(3). The contract that creates the PMSI may allocate any payments received in any way, and that allocation will bind the parties. § 9–103(e). In case of any dispute, it is the debtor's burden to show variance with these rules. § 9–103(g).

In addition, to the extent that the scope of the PMSI matters in nonconsumer matters, Comment 7a to § 9–103 indicates that the Dual Status Rule is preferred. It states:

> For transactions *other than consumer-goods transactions*, this Article approves what some cases have called the "dual-status" rule, under which a security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent.

Official Comment 7a to UCC § 9–103 (emphasis added).

These PMSI rules, if nothing else, are clear. But would they apply in this case if the UCC governed? That issue would be decided by § 9–103(h), the key section for present purposes:

> The limitation of the rules in subsections (e), (f), and (g) to transactions *other than*

*consumer-goods transactions* is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court *may not infer* from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

UCC § 9–103(h) (emphasis added). In other words, the new PMSI rules in revised Article 9 do not apply to consumer-goods transactions.

To understand this exclusion for consumers, we must examine both § 9–103's text and its history. First, as a matter of statutory interpretation, the exclusion of some consumers from the rules related to purchase money security interests applies only to "consumer-goods transactions." That term is defined in § 9–102(a) as follows:

> (24) "Consumer-goods transaction" means a consumer transaction in which:
>
> (A) an individual incurs an obligation primarily for personal, family, or household purposes; and
>
> (B) a security interest in consumer goods secures the obligation.

This definition requires understanding of what a "consumer transaction" is, and that term is also defined in § 9–102(a):

> (26) "Consumer transaction" means a transaction in which
>
> (i) an individual incurs an obligation primarily for personal, family, or household purposes,
>
> (ii) a security interest secures the obligation, and
>
> (iii) the collateral is held or acquired primarily for personal, family, or household purposes. The term includes consumer-goods transactions.

Why does subsection (h) exclude such consumer transactions, and why does it con-

tain the strange provision forbidding courts to infer that the business rules apply to consumers?[22] The answer is unclear, but for present purposes, the upshot of this exclusion is that the UCC has no clear answer on what rule to apply to consumers. There is a textual abdication and agnosticism in revised Article 9 regarding the proper treatment of consumer issues. UCC § 9–103(h); *see also* UCC § 9–626(b) (adopting same approach to proper rule regarding availability of deficiency against consumers when secured party does not conduct foreclosure in compliance with Article 9). This "hands off" approach permits different interpretations among states and also may lead to different results within a state.

Even worse, § 9–103(h) has not been uniformly adopted by the states. At least nine states, including one in the Ninth Circuit, did *not* adopt it. U.C.C. § 9–103, 3 U.L.A. 91–92 & Supp. 26 (2002 & Supp. 2008). The states include Florida, FLA. STAT. ANN. § 679.1031 (2007); Idaho, IDAHO CODE ANN. § 28–9–103 (2007); Indiana, IND.CODE ANN. § 26–1–9.1–103 (2007); Kansas, KAN. STAT. ANN. 84–9–103 (2007); Louisiana, LA.REV.STAT. ANN. § 10:9–103 (2007); Maryland, MD.CODE ANN., COM. LAW § 9–103 (2007); Nebraska, NEB.REV.STAT. ANN., U.C.C. § 9–103 (2007); North Dakota, N.D. CENT.CODE § 41–09–03 (2007); and South Dakota, S.D. CODIFIED LAWS § 57A–9–103 (2007).

At least in this critical respect, the Uniform Commercial Code is not uniform. As a result, the likelihood of uniform interpretation of state law is not high.

This nonuniformity raises significant concerns with respect to any proposal to borrow the UCC "interpretation" in an effort to achieve a uniform application of the hanging paragraph. As the Supreme

Court has stated, "[u]ndoubtedly, federal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)(quoting *United States v. Yazell*, 382 U.S. 341, 354, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966)).

b. *The UCC's Disavowal of the Intent to Inform Interpretation of the Bankruptcy Code Terms*

In addition to the problem of nonuniformity, there is no recourse to the notion that the term "purchase money security interest" has a nonfederal meaning that permeates commerce. This is shown by the UCC itself, which reflects a much more limited scope that intentionally does not extend to federal law. Comment 8 to § 9–103 states:

This section addresses only whether a security interest is a "purchase-money security interest" under this Article, primarily for purposes of perfection and priority. *See, e.g.,* §§ 9–317, 9–324. In particular, its adoption of the Dual–Status Rule, allocation of payments rules, and burden of proof standards for non-consumer-goods transactions is not intended to affect or influence characterizations under other statutes. Whether a security interest is a "purchase-money security interest" under other law is determined by that law. For example, decisions under Bankruptcy Code Section 522(f) have applied both the dual-status and the transformation rules. The Bankruptcy Code does not expressly adopt the state law definition of "purchase-money security interest." *Where federal law does not defer to this Article,*

**22.** A partisan's view is recounted in Charles W. Mooney, Jr., *The Consumer Compromise in*

*Revised U.C.C. Article 9: The Shame of It All,* 68 OHIO ST. L.J. 215 (2007).

*this Article does not, and could not, determine a question of federal law.*

Comment 8 to UCC § 9–103 (emphasis added).

As the emphasized language makes clear, the drafters of the 2001 revisions to Article 9 knew that federal courts had already split in interpreting "purchase money security interest" under § 522(f) and other provisions. They thus demurred and stated the obvious: state law cannot control federal law. The addition of this comment by the reporters undercuts one of *Kamen's* key underpinnings, that commercial law requires uniformity of construction. Here, at least, the UCC itself rejects that conclusion and leaves to federal bankruptcy law to fashion interpretations consistent with the expectations of commerce and the goals of the federal statute.

### c. *The Differences in Purpose*

Comment 8 correctly states obvious federal supremacy concerns. As it indicates, the choices made in drafting the revised Article 9 were meant to deal with the functions of purchase money security interests in a state's commercial law system; the drafters did not aspire to create a definition that served federal bankruptcy goals as well.

All of which leads to an examination of the function of the hanging paragraph as it appears in the federal bankruptcy system. Strong reasons to borrow from state law would exist if the purposes of the hanging paragraph were congruent with the purposes of having PMSI's in Article 9; conversely, *Kamen's* concerns lessen significantly if these concerns do not align or are attenuated. *See Kamen,* 500 U.S. at 98, 111 S.Ct. 1711; *Ford,* 154 F.3d at 616.

Determining the purposes of the hanging paragraph is not an easy or a certain task. In reviewing the words that Congress used, it is essential to consider "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). If the interpretation of statutory language is not clear from the plain meaning of the words used, the statute's context within the overall statutory framework should be examined, with appropriate consideration of the legislative history. *Davis v. Mich. Dept. of Treasury,* 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (Citation omitted).

With those principles in mind, the relevant language of the hanging paragraph is, "For purposes of paragraph [1325(a)](5), section 506 shall not apply to *a claim* described in that paragraph if the creditor has a purchase money security interest securing *the debt* that is the subject of *the claim* . . . ." (emphasis added). Congress did not state specifically that the hanging paragraph applied to a claim or debt "or any part or portion" of either. Neither did Congress specify that the hanging paragraph could be applied only to the "entire" claim or debt. As indicated above, the hanging paragraph does not direct courts to apply the UCC, or any other statute, to interpret the scope of "purchase money security interest."

From the language of the hanging paragraph itself and its limited legislative history,[23] it appears that the hanging para-

---

**23.** Judge Lundin has examined in detail the hanging paragraph's legislative history. See

graph was designed to combat a particular perceived abuse by debtors in chapter 13: purchasing a car shortly before a chapter 13 bankruptcy filing and then taking advantage of the substantial depreciation that occurs immediately after a new car is driven off the lot. As summarized in *Pajot*:

> Prior to BAPCPA, vehicle financers could be harmed by a debtor who acquired a vehicle in the months leading up to bankruptcy, then filed bankruptcy and crammed the creditor's claim down to the collateral value on the date of filing. Due to the rapid depreciation of motor vehicles the moment they leave the dealer's lot, debtors could often reap a benefit by cramming down the debt, only paying a secured claim equal to the depreciated value of the car ... In enacting the hanging paragraph, Congress fixed this disparity to ensure that debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in bankruptcy.

371 B.R. at 159. *See In re LaVigne,* 2007 WL 3469454 at \*11.

This purpose, to prevent abusive use of the Bankruptcy Code's treatment of secured claims in chapter 13, is a far cry from Article 9's effort to meet commercial expectations when vendors sell new goods to debtors or to spare the filing system from endless consumer filings. It calls for an independent look at the options available to treat the non-PMSI (but still secured) portion of car debt in chapter 13.

## 2. *The Options*

Once a portion of the debt securing a car loan is found not to be secured by a pur-

chase money security interest, the issue becomes how to treat the difference. As indicated above, the UCC defaults in nonconsumer cases to the Dual Status Rule. Com. 7a, UCC § 9–103. Many courts, however, have adopted the Transformation Rule, or something like it, in recognition of the narrow purposes and preferences served by the purchase money concept.

### a. *Transformation Rule*

■ "The 'transformation rule' provides that when a transaction contains both purchase money and non-purchase money obligations, the entire transaction is transformed into a non-purchase money obligation." *In re Burt,* 378 B.R. 352, 359 n. 34 (Bankr.D.Utah 2007). Courts that have applied the Transformation Rule have generally held that the hanging paragraph does not afford any protection against cramdown of the secured creditor's claim. *See In re Blakeslee,* 377 B.R. at 730; *In re Price,* 363 B.R. at 746.

The Transformation Rule enjoyed some support in the bankruptcy context before Congress adopted the hanging paragraph. *See, e.g., In re Freeman,* 956 F.2d 252 (11th Cir.1992) (crosscollaterizing of PMSI collateral with non-PMSI collateral resulted in entire collateral being non-PMSI; lender abusing ability to perfect PMSI in consumer goods without filing); see *also* Clark & Clark, *supra,* at ¶ 12.02[2]. But cases such as *Freeman* attempt to stop abusive use of Article 9. There, the lender sold tools to the debtor and took a security interest in those tools to secure the unpaid purchase price. Without more, that should have created a purchase money security interest. But the lender also se-

his addendum in *In re Hayes,* 376 B.R. at 655, 676–684 (Bankr.M.D.Tenn.2007). *See also* William C. Whitford, *A History of the Automobile Lender Provisions of BAPCPA,* 2007 U. Ill. L.Rev. 143. A shorter description is Richardo

I. Kilpatrick, *Selected Creditor Issues under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,* 79 Am. Bankr.L.J. 817, 834–35 (2005).

cured some prior, unrelated, debt with the new tools. It later claimed that the interest in tools was perfected without the need of a financing statement. The court found that this attempt to secure antecedent debt justified transforming the entire debt into nonpurchase money debt. *Freeman*, 956 F.2d at 255.

An argument might be made that financing negative equity is no different from what the lender in *Freeman* did. After all, financing negative equity is essentially identical to rolling existing debt into the financing offered to obtain the car. But in the typical negative equity situation, there is no ulterior motive or benefit present. Here, as in most negative equity situations, there is no doubt that all necessary steps to perfect the security interest were taken, and they were made public by virtue of their notation on the car's certificate of title.

At least two recent cases apply the Transformation Rule, or something like it, to security interests secured by negative equity obligations. *In re Mitchell*, 379 B.R. at 140–41; *In re Sanders*, 377 B.R. at 855. *Mitchell* and *Sanders* focus on the phrase "if the creditor has a purchase money security interest securing the debt that is the subject of the claim." Their reasoning is that Congress's use of the conditional "if" rather than more flexible language such as "to the extent," coupled with the omission of any quantifying modifier to the word "debt," for example, "part of" the debt, requires an absolute result, mandating application of the Transformation Rule, or something like it, rather than the Dual Status Rule.[24]

These approaches, however, are not entirely satisfactory. *Sanders* and *Mitchell* assume that exegesis of the hanging paragraph reveals that Congress intended mixed or hybrid security interests securing one claim to be disqualified from receiving the benefits of the hanging paragraph. *In re Sanders*, 377 B.R. at 860–64 & n. 21; *In re Mitchell*, 379 B.R. at 141–142. This analysis is doubtful for at least two reasons: first, the hanging paragraph is not a text that lightly gives up its meaning, let alone a plain meaning, and the use of standard interpretive conventions is not likely to yield a canonical reading strong enough to support such a drastic rule. Second, and more important, the analysis turns on the assumption that "debt" refers to a unitary concept that cannot be divided.

But the rest of the Code belies this assumption, as shown by § 506(b) and other similar sections that slice and dice debts to give different amounts different treatment. Put another way, *Sanders* and *Mitchell* ignore that a creditor may have several secured claims securing one debt if the debt is secured by more than one type of collateral. We choose here to interpret the hanging paragraph and § 1325(a) to

24. In yet another analytical variation, *In re Westfall*, 376 B.R. 210 (Bankr.N.D.Ohio 2007)used the "excluded purpose" doctrine of federal statutory interpretation to conclude that it was not appropriate to look to state law to ascertain whether the Transformation Rule or the Dual Status Rule should apply to determine the impact on a PMSI when part of the subject debt is not a purchase money obligation. "Excluded purpose means that a state statute should not serve as a federal rule of decision if the federal purpose was excluded from the state law. That is the case in the state law definition of purchase money." *In re Westfall*, 376 B.R. at 216–17. Applying this rule, the court observed that Official Comment 8 expressly provides that the state law definition of PMSI was not meant to apply to bankruptcy law. Without analyzing the language of the hanging paragraph, the court "adopted" the Dual Status Rule because "[s]imply, application of the transformation rule is too severe." *Id.* at 219.

mean that a lender has several claims, one secured by a PMSI, and the other not.

### b. Dual Status Rule

 The state law Dual Status Rule recognizes that PMSIs may be divided, and that a secured obligation may be fractionalized, with one part secured by a PMSI and another part secured by a standard security interest. The treatment accorded each thus follows these characterizations.

Bankruptcy law treats claims similarly. Most famously, § 506(a) bifurcates claims into secured and unsecured claims depending on the value of the collateral. Similar treatment of secured claims that include negative equity—that the entire claim is secured, with only part of if being secured by a PMSI—is easily applied here. And many courts have done so, albeit under the guise of borrowing state law rather than fashioning a uniform federal rule. *See In re Hernandez–Simpson*, 369 B.R. at 46; *In re LaVigne*, 2007 WL 3469454 at *1 n. 1; *In re Johnson*, 380 B.R. at 250; *Conyers*, 379 B.R. at 582; *In re Hayes*, 376 B.R. 655, 676 (Bankr.M.D.Tenn.2007); *In re Westfall*, 376 B.R. at 220–21; *In re Honcoop*, 377 B.R. 719 (Bankr.M.D.Fla. 2007); *In re Pajot*, 371 B.R. at 163; *In re Acaya*, 369 B.R. at 571.

These courts acknowledge that without any creditor action to be deterred or narrow policy goal to be vindicated, there is little reason to prefer something like the Transformation Rule, and in so doing echo

the holdings of other federal cases construing "purchase money security interest" in other provisions of the Code. *See, e.g., In re Billings*, 838 F.2d 405 (§ 522(f)); *In re Pan Am Corp.*, 124 B.R. 960, 970–72 (Bankr.S.D.N.Y.), *aff'd mem.*, 125 B.R. 372 (S.D.N.Y.), *aff'd*, 929 F.2d 109 (2d Cir.), *cert. denied*, 500 U.S. 946, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991) (former § 1110).

Indeed, the Dual Status Rule, as the default rule under Article 9, essentially captures both the lender's reasonable expectations and the debtor's economic situation, and is consistent with the apparent purpose of the hanging paragraph. Hence, in the context of the hanging paragraph, we are persuaded that the Dual Status Rule should be applied as the federal rule.[25]

The Dual Status Rule gives lenders a PMSI equal to the new value financed (or at least its value at filing) and a regular security interest for the balance. While this result raises issues of allocation of any payments since purchase,[26] an issue not present in this record, it ensures that lenders who do not finance negative equity receive the same treatment as lenders who assume the debtor's outstanding deficiencies. If the protections of the hanging paragraph are focused only on the new value extended, then car lenders do not have incentives to finance negative equity in order to receive better treatment in bankruptcy.

Similarly, adopting the Dual Status Rule would treat debtors who contract separate-

---

**25.** The difference between adopting the Dual Status Rule as a uniform federal rule, and borrowing it from the UCC, is that we would apply the Dual Status Rule even if, under the majority version of UCC § 9–103(h), a state decided to adopt the Transformation Rule in negative equity situations.

**26.** To further complicate matters, two states have adopted nonuniform variations to their

versions of Article 9 to specify definite rules for the allocation of consumer payments. Connecticut and Tennessee have changed their versions of § 9–103 to provide for consumer-favorable presumptions in the application of payments on consumer PMSIs. *See, e.g.,* CONN. GEN.STAT. ANN. § 42a–9–103a (e)(2) (2008); TENN.CODE ANN. § 47–9–103(e)(2) (2008).

ly to pay off a deficiency on a trade-in the same as those who roll that deficiency into the new car purchase. It would ensure that whether assumption of unsecured debt is paid in full in a chapter 13 plan turns not on the form in which the debt was satisfied but on the substance of the transaction.

These reasons make the Dual Status Rule preferable under the hanging paragraph for situations such as those present here. Accordingly, we adopt it.

## VI. Conclusion

Penrod financed about $7,100 of negative equity when she purchased her Taurus. In other words, when Americredit and its predecessor financed Penrod's purchase, they assumed and paid off her prior lender's unsecured claim for that amount.

Americredit now wants to treat its entire claim as subject to the hanging paragraph of § 1325(a), including the portion represented by its assumption of Penrod's unsecured debt. We disagree and hold that the portion of Americredit's collateral securing Penrod's negative equity is not a purchase money security interest within the meaning of the hanging paragraph.

That does not mean, however, that none of Americredit's security interest is purchase money. We reject the Transformation Rule and adopt the Dual Status Rule. Under that rule, Americredit receives purchase money status for that portion of its collateral not allocable to negative equity.

This is exactly the result reached by the bankruptcy court. We therefore AFFIRM.