07-3962-bk(L)

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued:    September 25, 2008          Question Certified: October 20, 2008)

Docket Nos. 07-3962-bk(L); 07-3952-bk(CON); 07-3964-bk(CON); 07-3986-bk(CON); 07-3990-bk(CON)

_____

IN RE: FAITH ANN PEASLEE, JONATHAN T. VANMANEN, MICHAEL COLOMBAI, SHANNON A. COLOMBAI, PAMELA D. JACKSON

_____

GEORGE M. REIBER,

*Defendant-Appellant*,

– v. –

GMAC, LLC, FORD MOTOR CREDIT COMPANY, GENERAL MOTORS ACCEPTANCE CORPORATION, SOVEREIGN BANK, HSBC AUTO FINANCE,

*Plaintiffs-Appellees.*

_____

Before: CALABRESI, STRAUB, and RAGGI, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the Western District of New York reversing a decision of the Bankruptcy Court and holding that negative equity on a trade-in vehicle is included in the purchase money security interest ("PMSI") accompanying a new car's purchase, and is therefore protected from cramdown by the Hanging Paragraph of Section 1325 of the Bankruptcy Code. We find that this case raises an important and recurring

question of New York state law—namely, whether negative equity is included in a purchase money security interest under New York's interpretation of the Uniform Commercial Code ("U.C.C."). We therefore CERTIFY that question to the New York Court of Appeals.

_____

GEORGE M. REIBER, Rochester, N.Y., *for Defendant-Appellant*.

BARKLEY CLARK (Katherine M. Sutcliffe Becker, *on the brief*), Stinson Morrison Hecker, LLP, Washington, DC, *for Plaintiffs-Appellees* GMAC, LLC and Ford Motor Credit Company

Matthew J. McGowan, Salter McGowan Sylvia & Leonard, Inc., Providence, R.I., *for Plaintiff-Appellee* Sovereign Bank

Martin A. Mooney, Mark D. Glastetter, Bonnie S. Baker, Deily Mooney & Glastetter, LLP, Albany, N.Y. *for Plaintiff-Appellee* HSBC Auto Finance

Richard Lieb, St. John's University School of Law, Jamaica, N.Y. (Ingrid M. Hillinger, *of counsel*), *for Amici Curiae* Ingrid M. Hillinger, Michael Hillinger, Adam J. Levitin, Michaela M. White, and Jean Braucher in Support of Defendant-Appellant

Lewis W. Siegel (Tara Twomey, *of counsel*), New York, N.Y., *for Amicus Curiae* National Association of Consumer Bankruptcy Attorneys in Support of Defendant-Appellant

James J. White, Ann Arbor, MI, *for Amici Curiae* American Financial Services Association and National Automobile Dealers Association in Support of Plaintiffs-Appellees

_____

CALABRESI, *Circuit Judge*:

The underlying question in this case is whether the portion of an automobile retail instalment sale obligation attributable to a trade-in vehicle's "negative equity" (*i.e.*, debt owed above and beyond the current collateral value of the traded-in vehicle) should be considered part of the purchase-money security interest ("PMSI") arising from the sale of a vehicle, and therefore

protected from cramdown by the "hanging paragraph" of Section 1325 of the Bankruptcy Code. The answer to this federal question depends on the construction of the term "purchase-money obligation" in Section 9-103(a)(2) of the Uniform Commercial Code as adopted by New York. Because we believe that the New York Court of Appeals should be given the opportunity to address this important and recurring question of New York state law, we certify the question to the New York Court of Appeals.

## BACKGROUND

*A. Automobile Financing*

Many car buyers trade in their old vehicles toward the purchase of the new one. Frequently, however, the old vehicle is subject to a lien resulting from previous financing, and the debt secured by the lien on the trade-in exceeds the value of that vehicle. In such a situation, the buyer turns in a vehicle on which he or she owes more than the vehicle's current value. The difference between what is owed on the vehicle and what the vehicle is worth is often called "negative equity."

The Bankruptcy Court provided the following description of the automotive finance industry, which the parties do not dispute:

> Unlike years ago when vehicle loans were generally three years or less, a majority of vehicle loans today are for terms of five years or longer, and it is not unusual in Bankruptcy Court to see seven and even eight year vehicle loans. Since many buyers are no longer even required to make a down payment when they purchase a vehicle, many, if not most, vehicle loans of five years or longer end up "upside down" (the vehicle has a value of less than the outstanding loan) in less than four years. As a result, a substantial number of trade-ins are upside down, and it is fairly routine in Bankruptcy Court for debtors to acknowledge at their Chapter 13 confirmation hearings that they had: (1) "rolled-in" the unpaid balance of a loan on their trade-in when they acquired their current vehicle; and (2) no

doubt that their trade-in was worth significantly less than the amount of the outstanding loan. The GMAC Brief confirmed this in stating that between 26% and 38% of buyers have negative equity in their trade-in vehicle.

Sometimes a debtor's negative equity can be $15,000.00 or more on a relatively modestly priced vehicle, especially if they have rolled-in a series of vehicle loans.

In [the Rochester Division of the Western District of New York] it has been estimated that between 15% and 25% of Chapter 13 debtors have significant loan deficiency obligations from the repossession and sale of previously owned vehicles. The reasons for the repossessions may vary, but the significant amount of the deficiencies are clearly because of the length of the underlying car loans.

*In re Peaslee*, 358 B.R. 545, 554 (Bankr. W.D.N.Y. 2006) ("*Peaslee I*"); *see also In re Graupner*, 537 F.3d 1295, 1303 (11th Cir. 2008) ("According to estimates cited by the Creditor, and relied on by several courts, negative equity trade-in transactions occurred in from 29 to 38 percent of all new vehicle purchases in past years, and that figure appears to only be on the rise.").

It is common, therefore, for car buyers to trade in old cars whose street value is less than the amount the buyer owes on the old vehicle. Adjusting the sales contract for the new vehicle to account for this deficiency is known as "rolling in" the negative equity. This can be accomplished in many different ways, such as by marking up the price of the vehicle being purchased or by altering deposits and rebates.

When purchasing new cars, car buyers often engage in what are called purchase-money transactions. These occur when a seller retains an interest in the goods sold (here, the car) to secure payment of all or part of its price. This interest, known as a "purchase-money security interest" or PMSI, is today particularly valuable from the seller's perspective because it gets a

high priority in bankruptcy proceedings and, in the wake of the "hanging paragraph," is immune from cramdown.[1]

The question before us in these cases is whether rolled-in negative equity should be included in a PMSI.

*B. Facts of This Case*[2]

On August 28, 2004, Faith Ann Peaslee purchased a Pontiac Grand Am from Fox Auto Group, Inc. ("Fox Auto") for her personal use. Peaslee and Fox Auto entered into a "Retail Installment Contract" indicating that the total amount financed for the acquisition of the Grand Am was $23,180.00, even though the July 2004 National Automobile Dealers Association ("NADA") Guide indicated that the manufacturer's suggested retail price for the Grand Am was $17,070.00.

In connection with her purchase, Peaslee traded in a 1999 Chevrolet Blazer (the

---

[1] Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, a Chapter 13 debtor could in certain circumstances "bifurcate" a creditor's claim into secured and unsecured portions, paying the secured portion (*i.e.*, the portion equal to the value of the collateral) in full with interest while retaining the collateral, and paying the unsecured portion *pro rata* along with other unsecured creditors. 11 U.S.C. § 1325(a)(5)(B). As the Supreme Court has explained, in such a situation "the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.*, the present value of the collateral. The value of the allowed secured claim is governed by § 506(a) of the Code." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 957 (1997) (internal citations omitted). This procedure is known as "cramdown" because it forces a secured creditor to accept less than the value of its full claim.

[2] The facts in *Peaslee* are representative of the underlying question and are not in dispute. Accordingly, the statement of facts here is drawn directly from the Bankruptcy Court and District Court opinions. *See GMAC v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007) ("*Peaslee II*"); *Peaslee I*, 358 B.R. 545.

"Blazer"), which was valued at $10,925.00 in the Retail Installment Contract. The August 2004 NADA Guide indicated that the Blazer had a NADA Guide trade-in value of $7,375.00. At the time Peaslee traded in the Blazer, it was subject to a lien in favor of M & T Bank, which was owed $16,905.00. The Retail Installment Contract indicated a negative trade-in value for the Blazer of $5,980.00—the "negative equity" at issue in this case—which was "rolled" into the price of the Grand Am.[3]

On July 11, 2006, within 910 days of purchasing the Grand Am,[4] Peaslee filed a petition initiating a Chapter 13 bankruptcy (the "Peaslee Case"), and George M. Reiber, Esq. (the "Trustee") was appointed as her Chapter 13 Trustee. Peaslee filed a Chapter 13 Plan which provided that Peaslee would retain the Grand Am and, pursuant to Bankruptcy Code Section 506(a)(1),[5] that the claim of General Motors Acceptance Corporation ("GMAC") secured by the Grand Am, which GMAC had acquired from Fox Auto, was to be treated as an allowed secured

---

[3] The figures in this and the next several paragraphs do not entirely parse, but the parties do not dispute them.

[4] The hanging paragraph only applies to vehicles purchased within 910 days of the debtor's filing for bankruptcy. Such cars are known as 910 vehicles.

[5] Section 506 provides in relevant part that:
> (a) (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506.

claim in the amount of $10,950.00. This represented what Peaslee alleged to be the retail value of the Grand Am. The allowed secured claim of $10,950.00 was to be paid with interest, in equal monthly installments. The balance of the amount due to GMAC in connection with Peaslee's August 28, 2004 purchase of the Grand Am was to be allowed as an unsecured claim.[6] This represented a prototypical cramdown.

On July 27, 2006, GMAC filed an objection to Peaslee's Chapter 13 Plan, arguing that it did not provide for GMAC's Secured Claim to be paid in full in accordance with the hanging paragraph, which—as explained in more detail below—prohibits cramdown of PMSIs securing a debt incurred within 910 days of the filing of a bankruptcy petition where the collateral securing the debt is an automobile acquired for the debtor's personal use.

On September 8, 2006, the Trustee filed a Motion (the "Valuation Motion") requesting that the court, pursuant to Section 506(a)(1), determine that GMAC had an allowed secured claim for the $10,950.00 retail value of the Grand Am and an unsecured claim for the balance of the GMAC Secured Claim. The Valuation Motion argued, *inter alia*, that because GMAC had a purchase-money security interest for only a portion and not all of the debt included in the GMAC Secured Claim, the exception set forth in the hanging paragraph did not apply, and the GMAC Secured Claim was subject to the cramdown and bifurcation provisions of Sections 506(a)(1) and 1325(a)(5)(B).

On November 6, 2006, Peaslee's filed a Brief in Support of the Trustee's Valuation Motion, which asserted that: (1) as a general rule, if collateral secures debt for other than its own

---

[6] On October 10, 2006, GMAC filed a secured claim (the "GMAC Secured Claim") in the amount of $17,904.95. This would result in a $6,954.95 unsecured claim under the Debtor's proposed Section 506(a)(1) plan treatment.

purchase price, the resulting security interest is not a purchase money security interest for that portion of the debt; (2) because the Debtor refinanced at least $5,980.00 of negative equity as part of the two transactions evidenced by the Retail Installment Contract, that portion of the debt advanced to pay off the lien on the Blazer and included in the GMAC Secured Claim, which was not for the purchase price of the Grand Am itself, was non-purchase money and not secured by a purchase money security interest; and (3) since the GMAC Secured Claim was not all for purchase money debt, the hanging paragraph did not apply.

The Trustee filed similar valuation motions in other Chapter 13 cases involving secured claims filed by various other motor vehicle purchase financers. These creditors, along with GMAC, will be referred to collectively as the "Motor Vehicle Finance Group" or simply "the Group." In each individual case, counsel for the Motor Vehicle Finance Group filed opposition to the valuation motion and in most instances filed a brief in opposition to the motion. Because all of the cases in this consolidated appeal turn on the same question of whether rolled-in negative equity should be considered part of a PMSI under New York's interpretation of the U.C.C., we do not here consider any factors that might otherwise distinguish the cases.

On December 22, 2006, the Bankruptcy Court entered an opinion in favor of the Trustee, holding, *inter alia*, that: (1) the term purchase money security interest is specifically defined by New York's U.C.C. and does not include negative equity; (2) the debt from a prior car loan (the "negative equity") is not an expense connected to the purchase of a new car; and (3) such debt is not so closely intertwined with the new purchase that it should be considered as "enabling" the new transaction within the meaning of the U.C.C. *See Peaslee I*, 358 B.R. 545. Having found that the creditor's entire security interest was not a purchase-money security interest, the

Bankruptcy Court then had to determine how to deal with the fact that *some* of the debt was a PMSI and some (the negative equity) was not. The Bankruptcy Court employed what is known as the "transformation rule." Under this approach, the entirety of a PMSI is "transformed" into a *non*-purchase-money security interest if the collateral secures more than its own purchase price. Under the transformation approach, the Group's *entire interest*—including the portion attributable to the value of the collateral—does not qualify for PMSI status, did not qualify for protection from cramdown under the hanging paragraph.[7] GMAC timely appealed on December 29, 2006.

On January 11, 2007, the Bankruptcy Court entered an order confirming Peaslee's Chapter 13 plan. GMAC filed its notice of appeal from this decision on January 19, 2007.

The District Court consolidated Peaslee's case with three other appeals presenting similar issues, and directed each side to file a single main brief, with supplemental briefs as necessary.[8] In an order entered on August 15, 2007, the District Court reversed the Bankruptcy Court, and held that negative equity from a prior car loan was "incurred in connection with acquiring rights in" the new car, and therefore the Group's entire claims fell within the hanging paragraph. *See Peaslee II*, 373 B.R. at 258-62. Having so held, the District Court did not need to choose

---

[7] The alternative rule is known as the "dual status" rule. Under this approach, the secured claims would be bifurcated into the portion securing a purchase money obligation and the portion securing a non-purchase-money obligation. Only the former portion would then be treated as a purchase-money obligation.

[8] The appeal of one of the cases consolidated before the District Court, *In re Martinez*, 362 B.R. 600 (Bankr. W.D.N.Y. 2007), has since been dismissed as moot and severed from the cases currently under consideration. *See In re Martinez*, 07-3981-bk (Order 2d Cir. Feb. 5, 2008). On November 20, 2007, the District Court ordered that its *Peaslee* decision be applied to Ford Motor Credit Company's appeal in *In re Vanmanen*, consolidated in this Court. *See In re Vanmanen*, 07-3952-bk (Stipulation filed 2d Cir. Dec. 26, 2007).

between the transformation and dual status rules, and, hence, did not discuss the merits of these approaches or other issues peculiar to certain of the cases. *Id.* at 262 n.5.

The Trustee timely appealed the District Court's decision.

**DISCUSSION**

This appeal presents a purely legal[9] question of first impression in this Circuit: Is the portion of an automobile retail instalment sale obligation that is attributable to the "negative equity" on a trade-in vehicle included in the PMSI arising from the sale of the new vehicle, and therefore protected from cramdown by the hanging paragraph? For the reasons that follow, we believe that in order to resolve this question, we must first certify a question to the New York Court of Appeals.

The law of New York and Second Circuit Local Rule § 0.27 permit us, *sua sponte*, to certify to New York's highest court "determinative questions of New York law [that] are involved in a case pending before [us] for which no controlling precedent of the Court of Appeals exists." N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a). "We may certify a question if with respect to the question asked there is a statute implicated and its plain language does not answer the question." *City of New York v. Smokes-Spirits.Com, Inc.*, 541 F.3d 425, 456 (2d Cir. 2008) (internal quotation marks and alterations omitted). Certification is appropriate in this case for several reasons: "[S]tate law is not clear and state courts have had little opportunity to interpret it, [the question] raises important issues of public policy, [it] is likely to recur, [and] the

---

[9] "In an appeal from a district court's review of a bankruptcy court ruling, our review of the bankruptcy court is independent and plenary. We accept its factual findings unless clearly erroneous, but review its conclusions of law de novo." *In re Bell*, 225 F.3d 203, 209 (2d Cir. 2000) (citation omitted). As the questions in this case are purely legal, our review is *de novo*.

result may significantly impact a highly regulated industry." *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 505 (2d Cir. 2004) (citations and internal quotation marks omitted). As far as we and the parties have been able to determine, the issue in this case has not been addressed by any court of the State of New York, let alone the Court of Appeals. The profusion of cases percolating through the federal courts, *see In re Graupner*, 537 F.3d at 1300 (collecting cases),[10] and the nature of the automotive finance industry, as depicted by the Bankruptcy Court and recounted above, both establish that the issue, which has major implications for this industry and the availability of bankruptcy for individual debtors, is guaranteed to recur.

This case requires us to interpret the scope and effect of the notorious "hanging paragraph"—so called because it was put into the Bankruptcy Code without an alphanumeric designation. The paragraph, which was added to the Bankruptcy Code by the BAPCPA, § 306(b), 119 Stat. at 80, provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a *purchase money security interest* securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(*)[11] (emphasis added). The hanging paragraph has been interpreted as

---

[10] As this case was being briefed, the Eleventh Circuit handed down the only other Circuit opinion on point. *See Graupner*, 537 F.3d at 1296 ("This issue has been confronted by a number of bankruptcy and district courts throughout the country (with widely divergent results), but it appears to be of first impression in this or any other circuit."); *see also In re Westfall*, 376 B.R. 210, 213 (Bankr. N.D. Ohio 2007) (describing a "maddeningly inconsistent body of decisions").

[11] The hanging paragraph is variously identified as Section 1325(a)(*) and Section 1325(a)(9) of the Code.

prohibiting cramdown of PMSIs secured by an automobile purchased within 910 days of the debtor's bankruptcy filing.[12]

As the parties note, Congress failed to define "purchase money security interest" in the hanging paragraph or elsewhere. The parties agree that we must at least consider the U.C.C. (as adopted by New York) and the Comments thereto to define the phrase. We agree and believe furthermore that state law governs the definition of PMSI in the hanging paragraph. *Cf. Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. . . . The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests . . . ."); *In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996).[13] Section 9-103(a)(2) of the U.C.C. describes a "purchase-money

---

[12] In some of the cases before us in this consolidated appeal, it appears that *both* vehicles may have been purchased within 910 days of the bankruptcy filing. In other cases before us, this is not so. In any event, the distinction, while perhaps significant for the ultimate resolution of these cases, does not impact our decision to certify.

[13] We recognize that Official Comment 8 to U.C.C. § 9-103, adopted when Article 9 was revised, provides that Article 9 "does not, and could not, determine a question of federal law." N.Y. U.C.C. § 9-103, cmt. 8. This reservation was formulated in response to the use of state law by courts interpreting other provisions of the Bankruptcy Code, but is potentially relevant to our analysis here. *See* Permanent Editorial Board (PEB) for the Uniform Commercial Code, PEB Study Group, Article 9, *Report*, 99 n.6 (Dec. 1, 1992). Nevertheless, Congress, presumably aware that its prior use of this term of art had led courts to resort to state law and that state law responded with Comment 8, once again used this term of art without providing a federal definition or any interpretive guidance. Thus, notwithstanding Comment 8, we believe Congress, in accordance with "the settled principle that creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code," *Travelers Cas. and Sur. Co. of American v. Pac. Gas and Elec. Co.*, 127 S. Ct. 1199, 1204-05 (2007) (citation, internal quotation marks and alterations omitted), meant to incorporate state law to define the term

-12-

obligation" as an obligation "incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." N.Y. U.C.C. § 9-103(a)(2).[14] The official Comments to the U.C.C. provide somewhat more guidance. *See Westfall*, 376 B.R. at 217-18 (noting that although the U.C.C. Comments are not "given binding effect," they do "occupy an unusual position as aids to statutory interpretation" and should be regarded as "an indispensable part of the U.C.C. framework") (internal quotations and citations omitted). Most relevant for this case is the language of Official Comment 3. It addresses the definition of "purchase-money obligation" set out above and provides a partial list of such obligations, which "include[]":

---

"purchase money security interest" in the BAPCPA.

[14] Section 9-103 of the N.Y. U.C.C. provides, in part, that:
> (a) Definitions. In this section: (1) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and (2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used. (b) Purchase-money security interest in goods. A security interest in goods is a purchase-money security interest: (1) to the extent that the goods are purchase-money collateral with respect to that security interest; . . . (g) Burden of proof in non-consumer-goods transaction. In a transaction other than a consumer-goods transaction, a secured party claiming a purchase-money security interest has the burden of establishing the extent to which the security interest is a purchase-money security interest. (h) Non-consumer-goods transactions; no inference. The limitation of the rules in subsections (e), (f), and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

N.Y. U.C.C. § 9-103.

obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

N.Y. U.C.C. § 9-103, cmt. 3.

The language of Section 9-103 does not make clear whether rolled-in negative equity falls within the definition of "purchase-money obligation," and New York courts have not yet considered whether such negative equity is "incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." N.Y. U.C.C. § 9-103(a)(2). Negative equity is not specifically included among the purchase-money obligations listed in official Comment 3. But the terms of that list are non-exhaustive, and it is possible that negative equity is one of the "expenses incurred in connection with acquiring rights in the collateral" or one of the "other similar obligations" covered by the comment.

Other New York statutes do not give us sufficient guidance. The New York Motor Vehicle Retail Instalment Sales Act ("MVRISA") includes a definition of "cash sale price" codified at Section 301(6) of the New York Personal Property Law. In 1994, the New York legislature amended Section 301 to include negative equity in the "cash sale price" provided in an automobile retail instalment sales contract. *See* N.Y. Pers. Prop. Law § 301(6) (McKinney Supp. 2007) (authorizing the inclusion of "the unpaid balance of any amount financed under an outstanding motor vehicle loan agreement or motor vehicle retail instalment contract" in the "cash sale price stated in a retail sales instalment contract"). This arguably supports a conclusion that the term "price," as used in N.Y. U.C.C. § 9-103, should be read *in pari materia* with

MVRISA's definition of "cash sale price," which includes negative equity. *See Peaslee II*, 373 B.R. at 261; *Plato's Cave Corp. v. State Liquor Auth.*, 68 N.Y.2d 791, 793 (N.Y. 1986) ("[S]tatutes which relate to the same or to cognate subjects are *in pari materia* and to be construed together unless a contrary intent is clearly expressed by the Legislature.").

Both the N.Y. U.C.C. and the MVRISA are relevant to automotive sales. But it is not manifest that "price" in N.Y. U.C.C. § 9-103(a)(2), or "expense" in Comment 3 to that provision, should be given the same meaning as "cash sale price" in the MVRISA. The MVRISA as a whole does regulate the creation of security interests to some extent, *see Peaslee II*, 373 B.R. at 360-61 (citing N.Y. Pers. Prop. Law § 314); *In re Petrocci*, 370 B.R. 489, 501 (Bankr. N.D.N.Y. 2007). But it can also be interpreted as having been enacted primarily to insure adequate financial disclosure in consumer transactions. *See Peaslee I*, 358 B.R. at 556-57. The N.Y. U.C.C., instead, is an overall regulatory regime for commercial transactions. Nor is it entirely clear that negative equity is added to the "price" of the new vehicle in the usual case, or even in the case before us. As noted above, negative equity can be "rolled in" in any number of ways—for example by inflating the price of the vehicle being purchased or altering deposits and rebates. The Peaslee contract itself lists the negative equity in a section entitled "amount financed," and although the same figure may well also have been included under the heading "cash price," the figures do not entirely add up. All this leaves uncertain the significance, to the case before us, of the MVRISA. Accordingly, in certifying the underlying questions, we invite the New York Court of Appeals, should it wish to do so, to consider the relevance, if any, of the MVRISA.

We believe that these questions—which are exquisitely state law issues, despite their

relevance to our interpretation of the Bankruptcy Code—are best considered by New York's highest court. We therefore offer the New York Court of Appeals the opportunity to guide us, should it opt to do so, and we certify the following question:

> Question Certified: Is the portion of an automobile retail instalment sale attributable to a trade-in vehicle's "negative equity" a part of the "purchase-money obligation" arising from the purchase of a new car, as defined under New York's U.C.C.?

Should the New York Court of Appeals choose to grant certification, it is, as always when we certify, invited to address any other issues it deems germane to this question.

It is hereby Ordered that the Clerk of the Court transmit to the Clerk of the New York Court of Appeals a Certificate in the form attached, together with a copy of this opinion and a complete set of the briefs, appendices, and record filed by the parties and amici in this court. This panel will retain jurisdiction to decide the case once we have had the benefit of the views of the New York Court of Appeals, or once that court declines certification.