TYMKOVICH, Circuit Judge,
dissenting.
I respectfully dissent because I read the Kansas Uniform Commercial Code, which controls the resolution of this case, as providing a narrower definition of “purchase money security interest” (PMSI) than the majority adopts.
In my view, Kansas law prohibits lenders from using a PMSI to secure a loan for negative equity, even if the loan is bundled with a standard car loan that is itself secured with a PMSI. Therefore, Ford Motor Credit Company does not have a PMSI covering the portion of the Fords’ loan attributable to the $7,200 of negative equity in their truck. And because the hanging paragraph, 11 U.S.C. § 1325(a)(*), applies only to PMSIs, the $7,200 is not protected from cram down. Even so, Kansas’s dual-status rule preserves PMSI status for the remaining portion of the Fords’ loan and that portion is therefore immune from cram down.

I. PMSIs Under Kansas Law

As the majority recognizes, a basic tenet of bankruptcy — and the starting point of this case — is the Butner principle: “Property interests are created and defined by state law.” Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); see also Raleigh v. Ill. Dep’t of Revenue, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). The principle arises because generally, bankruptcy law is not designed to fundamentally alter property rights. Instead, “a bankruptcy proceeding is principally a forum in which all of a debtor’s creditors can gather, assemble the debtor’s assets, and divide them among themselves, according to the rights that state law gives them.” Douglas G. Baird, Bankruptcy Procedure and State-Created Rights: The Lessons of Gibbons and Marathon, 1982 Sup.Ct. Rev. 25, 35.
The validity of the Butner principle is undisputed here, but it is worth emphasizing because the hanging paragraph employs a state law term of art, PMSI, to define its scope. See 11 U.S.C. § 1325(a)(*). Though “Congress of course may do what it likes with entitlements in *1287 bankruptcy,” Raleigh, 530 U.S. at 21, 120 S.Ct. 1951, it chose not to alter the state law definition of PMSI as it relates to the hanging paragraph. Therefore, the resolution of this case turns on whether Kansas law allows a creditor to secure a loan for negative equity with a PMSI. See Billings v. Avco Colo. Indus. Bank (In re Billings), 838 F.2d 405, 406 (10th Cir.1988) (“For [the definition of PMSI], the courts have uniformly looked to the law of the state in which the security interest is created.”); see also In re Price, 562 F.3d 618, 624 (4th Cir.2009); Graupner v. Nuvell Credit Corp. (In re Graupner), 537 F.3d 1295, 1298 (11th Cir.2008).[1]

A. PMSIs Generally

A PMSI is a “special type of security interest” that is created when a secured party (here, Ford Credit) “provides the credit that enables the debtor [the Fords] to obtain the collateral [the Fords’ new truck].” Keith G. Meyer, A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code, 50 Kan. L.Rev. 143, 152 (2001). In the consumer goods context, a common example of a transaction that creates a PMSI is a purchase using a store-issued credit card:
Typical credit sales should be relatively familiar to all of us, though we may not always recognize them. Each time we use our Sears Card to buy a drill, a stereo, furniture, etc., we participate in a credit sale. Sears is granting us credit to purchase those items from the store, and we are granting the store a PMSI in that item until it is paid off.
Christopher Harry, Comment, To Be (Transformed) or Not To Be: The Transformation Versus Dual-Status Rules for Purchase-Money Security Interests Under Kansas’ Former and Revised Article 9, 50 U. Kan. L.Rev. 1095, 1097 (2002). In this example, the consumer is the debtor, and Sears is the purchase-money lender.
Aside from the benefit conferred by the hanging paragraph (i.e., protection from cram down for some car loans), purchase-money lenders receive additional advantages under the U.C.C. and other law. Most importantly, a purchase-money lender has “super-priority” — -the lender’s claim to the purchase-money collateral trumps the claims of other secured creditors. See Matthews v. Transamerica Fin. Servs. (In re Matthews), 724 F.2d 798, 801 (9th Cir.1984) (“Purchase money security is an exceptional category in the statutory scheme that affords priority to its holder over other creditors.... ”). Additionally, unlike other security interests, PMSIs in household goods cannot be “avoided” (i.e., extinguished) in bankruptcy. See 11 U.S.C. § 522(f)(1)(B); see also In re Billings, 838 F.2d at 406 (“[I]f the security interest ... retains its status as a purchase money security interest ... then debtors may not avoid the security interest under § 522(f).”). In the household goods context, PMSIs have yet another benefit: Federal Trade Commission regulations prohibit lenders from taking “a nonposses-sory security interest in household goods *1288 other than a purchase money security interest.” 16 C.F.R. § 444.2(a)(4) (emphasis added).
Because of the advantages of PMSIs, lenders sometimes attempt to use them to secure obligations unrelated to purchase-money collateral. Indeed, “overloaded” PMSIs are a recurring concern in the law of secured transactions, and jurisdictions have adopted various mechanisms to prevent them. See Ann E. Conaway Stilson, The “Overloaded” PMSI in Bankruptcy: A Problem in Search of a Resolution, 60 Temp. L.Q. 1, 16 (1987).[2]
Some jurisdictions eliminate PMSI status if a lender attempts to secure a loan that exceeds the amount required for the debtor to obtain the collateral. See Marion W. Benfield, Jr., Consumer Provisions in Revised Article 9, 74 Chi-Kent L.Rev. 1255, 1292 (1999). Under this so-called “transformation” rule, “a security interest that was originally a purchase money interest loses that status entirely if the debt is restructured and an additional nonpur-chase money advance is made.” Id.; see also In re Matthews, 724 F.2d at 801 (applying the transformation rule under California law).
Other jurisdictions, including Kansas, adopt the “dual-status” rule, which preserves an overloaded PMSI “to the extent that it secured the price of the original goods even though the security agreement also secured the price of other items.” Meyer, 50 Kan. L.Rev. at 155-56 & n. 64; Kan. Stat. Ann. § 84-9-103(f) (2007) (“[A] purchase-money security interest does not lose its status as such, even if: ... the purchase-money collateral also secures an obligation that is not a purchase-money obligation.”); see also Snap-On Tools, Inc. v. Freeman (In re Freeman), 956 F.2d 252, 254-55 (11th Cir.1992) (“A security interest in collateral is ‘purchase money’ to the extent that the item secures a debt for the money required to make the purchase. If an item of collateral secures some other type of debt, e.g., antecedent debt, it is not purchase money.”).
These principles underscore that the benefits of PMSIs come with certain limitations. When Congress chose to use the state law term PMSI to confíne the scope of the hanging paragraph, it adopted these state law limitations as well and made them applicable in bankruptcy.

B. The Kansas Definition of PMSI

The majority identifies the key Kansas statutory language governing whether negative equity may be secured with a PMSI. As the majority states, “[t]he issue is whether paying off negative equity in a trade-in car is part of the ‘price’ of the new car or part of the ‘value given to enable’ acquisition of the new car.” Maj. Op. at 1284. I agree with the majority that under the Kansas U.C.C., these terms include more than just the vehicle’s sticker price. But I disagree with the majority’s broad interpretation of these terms. In my view, Comment 3 to U.C.C. § 9-103 provides the limiting framework.
Notably absent from the items contained in Comment 3 is a description of negative equity. Instead, the comment lists items *1289 which are part of the “price” of a new car or the “value given to enable” the purchase of a new car. Granted, the list is nonexclusive and includes “other similar obligations.” But Comment 3 tells us that a PMSI “requires a close nexus between the acquisition of collateral and the secured obligation.” Under familiar principles of statutory interpretation, the other items on Comment 3’s list shed light on whether negative equity bears the requisite “close nexus” to the acquisition of a new car. See Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961) (“The maxim noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.”); State v. Urban, 40 Kan.App.2d 517, 193 P.3d 515, 518 (2008) (employing the maxim to interpret a Kansas statute).
The items on Comment 3’s list — such as sales tax, finance charges, freight charges, costs of storage in transit, attorney’s fees, and collection costs — are all expenses that will be charged uniformly to any potential purchaser of a vehicle who chooses to finance the purchase. Each item is akin to a transaction cost, a cost that adds no particular value for either the buyer or the seller but is instead simply “the cost of using the price mechanism.” R.H. Coase, The Nature of the Firm, 4 Economica 386, 390 (1937); see also Black’s Law Dictionary 372 (8th ed.2004) (defining “transaction cost” as “[a] cost connected with a process transaction, such as a broker’s commission, the time and effort expended to arrange a deal, or the cost involved in litigating a dispute”); Harold Demsetz, The Cost of Transacting, 82 Q.J. Econ. 33, 35 (1968) (“Transaction cost may be defined as the cost of exchanging ownership titles.”).
Negative equity is different. It is not a transaction cost, but a transfer of money for value.[3] Much like a home equity loan used to pay a preexisting credit card debt, the portion of the auto loan attributed to negative equity is not used for the purchase of some new piece of collateral or the costs inherent in the purchase. It is used for another purpose altogether. See Americredit Fin. Servs., Inc. v. Penrod (In re Penrod), 392 B.R. 835, 852 (9th Cir.BAP2008) (“[Negative equity is nothing more than a refinancing of the preexisting debt owed on the trade-in. There is no necessary connection between this refinancing and the car’s acquisition.”). Unlike the other expenses listed in Comment 3, the amount (and even the existence) of negative equity depends upon circumstances completely unrelated to the price of the new vehicle and its financing or the costs associated with transfer of title. Indeed, negative equity differs vastly for each purchaser, depending in large part on the purchaser’s past choices.
Thus, although the Fords and their dealer were free to use the new pickup as security for a loan to pay an antecedent debt, that does not mean paying the old debt was part of the “price” of the pickup. Nor does it mean the portion of a loan used to pay off the old debt was a purchase money security interest. As a Texas bankruptcy court stated:
*1290 One may borrow money to buy something (e.g., a new vehicle), and also borrow additional money for some other purpose (e.g., to pay off the balance of a loan for the trade-in vehicle). The part used to buy something is purchase money obligation. The part used for some other purpose is not.
In re Sanders, 377 B.R. 836, 853 (Bankr.W.D.Tex.2007), rev’d, 403 B.R. 435 (W.D.Tex.2009). In my view, this is a more consistent interpretation of the Kansas U.C.C. than the majority’s. By interpreting the term “price” in section 84-9-103(a)(2) to mean the actual price of the vehicle plus amounts akin to transaction costs, the limits of PMSIs are easily discernible. In contrast, allowing a creditor to create a PMSI for any money advanced at the same time as a sale enables the creditor to overload the PMSI and defeats the limitations imposed by state law.

C. The Dual-Status Rule

Because I would hold that Ford Credit does not have a PMSI securing its loan for the Fords’ negative equity, I must answer “the question of what to do with that portion of the debt not entitled to purchase-money status.” See In re Penrod, 392 B.R. at 838.
As mentioned above, Kansas has adopted the dual-status rule, which preserves a PMSI to the extent it secures a purchase-money obligation and destroys it to the extent the PMSI is overloaded. Kan. Stat. Ann. § 84-9-103© (2007); see also Harry, 50 U. Kan. L.Rev. at 1121-22 (noting that, unlike the standard version of Article 9, the Kansas version expressly adopted the dual-status rule for all transactions, including consumer transactions); see also In re Gibson, 16 B.R. 257, 268-69 (Bankr.D.Kan.1981) (applying Kansas law and adopting the dual-status rule in the consumer context).[4] Consistent with the Butner principle, I would hold that the Kansas dual-status rule applies: part of Ford Credit’s claim is a PMSI protected from cram down, and part is merely a standard secured claim which may be subject to cram down.
This does not resolve the case, however. Another question remains, namely how to adjust Ford Credit’s claims to account for payments the Fords made on their car loan before entering bankruptcy. Should the payments be applied first to the negative equity portion of the loan, or should they be applied first to the PMSI portion of the loan? Kansas law states that payments must be applied “[i]n accordance with any reasonable method of application to which the parties agree.” Kan. Stat. Ann. § 84 — 9—103(e)(1) (2007). In the absence of such an agreement, Kansas law requires courts to consider “any intention of the obligor manifested at or before the time of payment.” Id. § 84-9-103(e)(2). Finally, if no such intent was manifested, payments go first to the PMSI, then to the non-PMSI. See id. § 84-9-103(e)(3); In re Kellerman, 377 B.R. 302, 304 (Bankr.D.Kan.2007). I would remand this case, instructing the bankruptcy court to apply these rules to determine the amount of Ford Credit’s claims.

II. Other Approaches

I recognize my conclusion is at odds with the majority’s reasoning, and with the reasoning of a number of other courts that have addressed the treatment of negative *1291 equity under the hanging paragraph. These courts have made numerous arguments, and several common themes have emerged.
Some courts- — -including the majority— conclude that the financing of negative equity is part of a “package deal” and as such should be protected by the same PMSI that covers the sale price of a new vehicle. See, e.g., In re Graupner, 537 F.3d at 1302. Others utilize the in pari materia canon (i.e., the canon that encourages courts to construe statutes together), holding that the term “price” in the U.C.C. includes negative equity, because this is how other laws define the term “price.” See, e.g., id. at 1301. Finally, some courts rely on the legislative history of the hanging paragraph to conclude Congress intended negative equity to be protected from cram down. See, e.g., In re Price, 562 F.3d at 628.
Though the majority does not make all of these arguments, I take this opportunity to explain why I find them unpersuasive.

A. The “Package Deal” Approach

One common line of reasoning holds that negative equity is part of a “package deal” and cannot be separated from the remainder of the PMSI. The In re Graupner court, for example, viewed the financing of negative equity as “part of the same transaction” as the purchase of the new vehicle such that it was “properly regarded as a ‘package deal.’ ” 537 F.3d at 1302. To the Eleventh Circuit, negative equity was an “integral part” of the purchase and was “inextricably intertwined” with the transaction. Id.; see also In re Price, 562 F.3d at 625 (“All of the Prices’ debt ... was incurred at the same time, in the same contract, and for the same purpose: acquiring the new car.”). The majority adopts this approach, concluding that “the trade-in exchange is essentially a single transaction.” Maj. Op. at 1285.
The intuitive difficulty with this position is that vehicle purchasers — even those that buy on credit — are not required to purchase the new vehicle by trading in an old one. Whether doing so is necessary or even desirable depends on their individual circumstances. Perhaps in this case it is true that the Fords could not have purchased their new pickup without trading in their old one. And perhaps financing the negative equity was “integral” to the Fords completing their purchase, because it was inconvenient or impossible for them to complete the purchase any other way.
The definition of PMSI, however, does not encompass any and every expense that might enable a particular purchaser to complete the purchase in the most convenient manner. If the Fords were unable to drive themselves to the dealership, we would not consider the cost of a taxi as part of the price of the new truck, even if the dealer were willing to pay for it and fold it into the sales contract. If the Fords did not qualify for a car loan because their resources were strained by too much credit card debt at high interest rates, they could not fold those debts into the PMSI for a new car even if the attendant lower interest rate solved their credit problem and enabled them to obtain the car loan.
Allowing a creditor to transform antecedent debt into a PMSI by refinancing the debt into a new contract amount that includes the purchase price of new collateral would convert the concept of “purchase money” from a defined term to one that can be expanded at the will of the parties. See In re Conyers, 379 B.R. 576, 582 (Bankr.M.D.N.C.2007) (“Allowing the Debtor to rollover negative equity into the new loan was simply an accommodation. It was an arrangement made as a favor to another.”); In re Westfall, 365 B.R. 755, 762 (Bankr.N.D.Ohio 2007) (providing the *1292 extreme example of a “debtor [who] would not have made it to the dealer’s lot were it not for the emergency appendectomy, [making] payment of the doctor’s outstanding fee ... an enabling expense”), rev’d in part, 376 B.R. 210.
Congress confined the hanging paragraph to PMSIs, and I cannot conclude the hanging paragraph protects any and every loan secured by an automobile.

B. The In Pari Materia Argument

Another approach is to apply the in pari materia doctrine. Courts employing this argument look to other statutes that use the term “price” — frequently, state motor vehicle financing statutes — and, when these other statutes explicitly include negative equity within the definition of price, interpret the U.C.C. in pari materia. See, e.g. In re Graupner, 537 F.3d at 1301 (finding support in the definition of “cash sale price” in Georgia’s Motor Vehicle Sales Financing Act); Gen. Motors Acceptance Corp. v. Peaslee, 373 B.R. 252, 260 (W.D.N.Y.2007) (analyzing the definition of “cash sale price” in New York’s Motor Vehicle Retail Installment Sales Act).
But at least some other courts have considered this a dubious application of the in pari materia doctrine, as the vehicle financing statutes are concerned more with disclosure than regulation and therefore do not cover the same subject matter. For example, the Second Circuit disapproved of a bankruptcy court’s reliance on the New York Motor Vehicle Retail Installment Sales Act in interpreting the U.C.C.’s definition of “price.” Reiber v. GMAC, LLC (In re Peaslee), 547 F.3d 177, 186 (2d Cir.2008) (“But it is not manifest that ‘price’ in N.Y. U.C.C. § 9-103(a)(2), or ‘expense’ in Comment 3 to that provision, should be given the same meaning as ‘cash sale price’ in the MVRISA.”). The Second Circuit noted the New York motor vehicle statute was aimed primarily at disclosure and served different purposes from the U.C.C., making an in pari materia interpretation of the term “price” suspect. Id.
I agree with the Second Circuit insofar as it views the in pari materia doctrine as inapplicable. Indeed, here the use of the in pari materia doctrine is even less helpful because the parties have pointed to no other Kansas statute defining the term “price.” Ford Credit points mainly to the federal Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq. — or, more specifically, to the Federal Reserve Board’s interpretation of that Act in Regulation Z, which requires disclosure of negative equity as part of the total sale price of an automobile. See 12 C.F.R. § 226.18(b)(2) & (j). But the manner in which a federal agency has interpreted the term “price” in a federal statute sheds little light on what the Kansas legislature meant when it employed the term in its version of the U.C.C. But see GMAC v. Horne, 390 B.R. 191, 202-03 (E.D.Va.2008) (adopting TILA’s definition of “total sales price” as the meaning of “price” under the Virginia U.C.C.).
I acknowledge that in its Uniform Consumer Credit Code, the Kansas legislature referred to both TILA and Regulation Z when it empowered an administrator to “adopt rules and regulations necessary to carry out the provisions and terms of the uniform consumer credit code which are consistent with or no less restrictive than the truth-in-lending act ... and regulation Z.” Kan. Stat. Ann. § 16a-6-117 (2007). Even so, there is no reason to believe that in doing so, the Kansas legislature meant to suggest the terms in its other statutes should now be interpreted as identical to an agency interpretation of a federal disclosure law. The Uniform Consumer Credit Code does not even use the word “price,” and I fail to see how the in pari materia canon can be helpful in determin *1293 ing what the legislature meant by “price” in Kan. Stat. Ann. § 84-9-103 (2007).
Additionally, even if I were to apply the in pari materia doctrine, it does not suggest negative equity is part of the “price” of a new vehicle. Under Kansas tax law, the term “sales or selling price” does not include “the amount equal to the allowance given for the trade-in of property.” Kan. Stat. Ann. § 79-3602(ll)(3)(D) (2007). Here, the “allowance given for the trade-in of property” was the $7,200 of negative equity in the Fords’ old truck. Kansas tax law excludes this amount from the sale price of the Fords’ new truck, and the in pari materia doctrine would therefore suggest the negative equity was not part of the sale price under the Kansas U.C.C. I doubt Kansas tax law — like other states’ motor vehicle financing statutes — tells us anything about the Kansas U.C.C. But a comparison to Kansas tax law illustrates that the in pari materia doctrine, even if applicable, does not offer much guidance in this case.

C. Legislative History

Finally, some courts examine the legislative history of the hanging paragraph and, despite its inconsistencies, find that it unambiguously supports the conclusion that negative equity is included in the state law definition of PMSI. See, e.g., In re Price, 562 F.3d at 628; In re Graupner, 537 F.3d at 1303 & n. 5. This is problematic for two reasons.
First, legislative history is “often murky, ambiguous, and contradictory,” and we should resort to it only when a statute’s plain language is unclear. See United States v. Hinckley, 550 F.3d 926, 947 (10th Cir.2008) (Gorsuch, J., concurring) (quoting Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005)), cert. denied, — U.S. -, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009). Indeed, the Supreme Court has “repeatedly held [that] the authoritative statement is the statutory text, not the legislative history or any other extrinsic material.” Exxon Mobil Corp., 545 U.S. at 568, 125 S.Ct. 2611. Here, the statutory language is far from ambiguous. It expressly states that only PMSIs are protected from cram down in bankruptcy. Whether this state law term of art is itself ambiguous is another story. Case law (including this very opinion) shows that courts can reasonably disagree on the meaning of the term under various state laws. But the plain language of the hanging paragraph is clear, making resort to its legislative history unnecessary and potentially misleading.
Second, the legislative history of the hanging paragraph provides no pat answer to whether negative equity is protected from cram down. As Ford Credit explains in its brief, one legislative proposal predating the enactment of the hanging paragraph was narrow and protected from cram down only the “unpaid balance of the purchase price of the personal property.” H.R.Rep. No. 105-794, at 25 (1998) (Conf. Rep.) (emphasis added). This language, if enacted, arguably would not have protected amounts such as title fees, taxes, or negative equity. But Ford Credit dismisses this language and emphasizes a competing version of the bill, which was broader and would have protected “an allowed claim that is secured under applicable non-bankruptcy law.” S.Rep. No. 105-253, at 7 (1998) (emphasis added). This language seems to encompass negative equity, which is part of a lender’s secured claim.
Congress ultimately settled on protecting only pin-chase money security interests from cram down. See 11 U.S.C. § 1325(a)(*). This might have reflected a Congressional compromise to protect certain fees that are properly considered part *1294 of a purchase-money loan — i.e., fees akin to transaction costs — and not to protect negative equity. But we are not privy to Congress’s internal deliberations, and this is why we ordinarily must confine our inquiry to the language of statutes as enacted. See Exxon Mobil Corp., 545 U.S. at 568, 125 S.Ct. 2611.
Ford Credit argues that the legislative history supports their position and implies that Congress intended to broadly protect car lenders, regardless of how loan proceeds are used. Other courts agree with this reading, assuming that the “architects of the hanging paragraph intended only good things for car lenders and other lien-holders.” In re Graupner, 537 F.3d at 1303 (internal alterations and quotation marks omitted) (quoting AmeriCredit Fin. Servs. v. Long (In re Long), 519 F.3d 288, 294 (6th Cir.2008)). These courts fail to recognize, however, that Congress must reconcile many competing interests when drafting legislation. Presuming Congress resolved all policy questions in favor of one constituency is simplistic and likely inaccurate. See Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 120, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (“We ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal — even assuming the precise intent of the group can be determined, a point doubtful both as a general rule and in the instant case. It is for the Congress, not the courts, to consult political forces and then decide how best to resolve conflicts in the course of writing the objective embodiments of law we know as statutes.”).
Congress specifically chose to use the term “purchase money security interest” instead of something broader. I believe the most prudent practice is to assume Congress meant what it said.

III. Conclusion

I conclude that negative equity is neither “all or part of the price of’ a new car, nor “value given to enable the debtor to acquire rights in or the use of’ a new car. Thus, I would hold that the Fords’ negative equity is not part of Ford Credit’s PMSI under Kansas law, and it is therefore not protected from bifurcation and cram down under the hanging paragraph. Under the dual-status rule, only the purchase price of the Fords’ new car and related fees that are akin to transaction costs are secured by a PMSI. Though I recognize my view is at odds with the conclusions of several other courts, including the Fourth and Eleventh Circuits, I believe my interpretation comports more closely with the meaning of purchase money security interest under the Kansas U.C.C. than does the opposing view.

. While I recognize Kansas’s U.C.C. provisions are similar to those in most states, that does not change the fundamental tenet that we interpret Kansas law consistent with the holdings of Kansas courts. As one judge put it, interpreting the U.C.C. to advance bankruptcy policy (assuming we can identify the correct policy at play here), "will becloud the clarity and predictability that the authors of Article 9 were seeking in enacting the statutes governing PMSIs.” In re Peaslee, 13 N.Y.3d 75, 86, 913 N.E.2d 387, 393, 885 N.Y.S.2d 1, 6, 2009 WL 1766000, 2009 N.Y. Slip Op. 05197, at *9 (N.Y. June 24, 2009) (Smith, J„ dissenting). Congress, of course, remains free to establish a uniform definition of PMSI *1288 applicable to cases governed by the hanging paragraph.

. Several federal circuit cases from the 1980s addressed the treatment of overloaded PMSIs in bankruptcy, with respect to the anti-avoidance provision in § 522(f). See In re Billings, 838 F.2d at 408 (suggesting that an obligation can “be considered only partly a purchase money debt,” and therefore a security interest can still be considered a PMSI with respect to the portion that is not overloaded (emphasis added)); Pristas v. Landaus of Plymouth, Inc. (In re Pristas), 742 F.2d 797, 801 (3d Cir.1984) (adopting "pro tanto preservation of purchase-money security interests,” but invalidating overloaded portions of PMSIs); In re Matthews, 724 F.2d at 801 (holding that when a creditor refinances a purchase money obligation, the PMSI is extinguished).

. The Fourth Circuit has suggested that negative equity is, indeed, a transaction cost because it is an expense incurred during the purchase of a new car. See In re Price, 562 F.3d at 627. I respectfully disagree. The Fourth Circuit’s approach equates any secured refinancing with a transaction cost. The term cannot bear such a broad definition. See Demsetz, 82 Q.J. Econ. at 35 (noting the problems inherent in a broad definition of "transaction cost"). That a loan for negative equity usually occurs in connection with the purchase of a new vehicle does not render it a transaction cost.

. Some courts have held that regardless of state law, federal policy requires the dual-status approach in the context of the hanging paragraph. See In re Penrod, 392 B.R. at 859 ("[W]e are persuaded that the Dual Status Rule should be applied as the federal rule.” (footnote omitted)); see also In re Hargrove, 400 B.R. 616, 620 (Bankr.M.D.Tenn.2008) (noting that the dual-status rule is “consistent with the purpose of” the hanging paragraph). But selectively applying the Butner principle, as these cases do, defeats its purpose.